**CHARLES SCHWAB & CO., INC., Plaintiff,**

**v.**

**The HIBERNIA BANK, Defendant.**

**No. C–87–0549RFP.**

United States District Court, N.D. California.

March 3, 1987.

Lawrence J. Siskind, Cooper, White & Cooper, San Francisco, Cal., for plaintiff.

Nathan Lane, III, Graham & James, San Francisco, Cal., for defendant.

## ORDER FOR PRELIMINARY INJUNCTION

PECKHAM, Chief Judge.

### FINDINGS OF FACT:

Plaintiff Charles Schwab & Co., Inc. ("Schwab") seeks to stop defendant, The Hibernia Bank ("Hibernia"), from making what plaintiff alleges to be an unauthorized use of its federally registered mark, THE EQUALIZER, in connection with the marketing of a Hibernia loan product.

The plaintiff is a California corporation with its principal place of business in San Francisco. Although plaintiff is currently a wholly-owned subsidiary of the BankAmerica Corporation, it is in the process of being purchased by the CL Acquisition Corporation, a newly-formed corporation controlled by Mr. Charles Schwab and executives of Schwab. Schwab is a financial company perhaps best known for its discount brokerage services but has a history of offering financial services in association with several banks.

On February 28, 1985, plaintiff began marketing its product, THE EQUALIZER, and obtained a U.S. Trademark Registration (No. 1,361,617), for the same on September 24, 1985. THE EQUALIZER product consists of a computer program which provides customers with a wide range of financial information, services, and opportunities. Schwab extends credit through this program by enabling users to trade on margin transactions—a loan secured by securities. In addition, users of THE EQUALIZER may obtain securities price quotations and research investment opportunities, and can use the program to check their brokerage account balances, update and price their portfolios, and create and maintain financial records. Schwab plans to expand the range of financial services available to include additional types of credit and debit accounts, and mutual fund and securities trading.

The defendant Hibernia is a corporation chartered in the State of California, engaged exclusively in the banking business, with its principal place of business in San Francisco. Hibernia has offered a home equity line of credit since May 1986, but in August 1986, began to develop a new home equity line of credit to take advantage of the new tax laws. In October, 1986, the defendant adopted the name THE EQUALIZER to identify the new product and began to market THE EQUALIZER home equity line of credit on January 20, 1987.

Plaintiff alleges that it learned about Hibernia's promotion on January 21, 1987; and immediately called the defendant to ask for samples of its promotional material, to demand that Hibernia stop using Schwab's mark, and to inform defendant of plaintiff's rights. Plaintiff's legal counsel sent a demand letter to defendant—January 28, 1987—imposing a deadline of January 30, 1987, for the defendant to assure Schwab that defendant would stop its infringing use. Defendant has not ceased to use the term THE EQUALIZER.

■ Plaintiff alleges five causes of action in its complaint: federal trademark and service mark infringement, false designation of origin in violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), unfair competition, trademark dilution, common law trademark infringement, and false advertising. On February 11, 1987, this court heard and granted plaintiff's application for a temporary restraining order. Plaintiff now moves for a preliminary injunction; defendant moves to strike testimony offered by the plaintiff in support of its motion.[1]

---

1. *Defendant's Motion to strike Testimony:* Defendant moves under Rule 56(e) of the Federal Rules of Civil Procedure; Local Rules 220–27 and 220–28; and Rules 602, 702, and 703, of the Federal Rules of Evidence, to strike eight lines of testimony from Kevin Randolph's Declaration in support of plaintiff's motion for a preliminary injunction.

The disputed portion of the declaration presents Randolph's comments on the type of market which the defendant's home equity line of credit would attract, namely a relatively young and affluent market of customers who are interested in expanding their assets, and gives his reasons for this opinion. Defendant objects to this testimony on two grounds: (1) that Schwab has failed to show that the witness

## DISCUSSION

*Plaintiff's Motion for a Preliminary Injunction:*

An action arising under the Trademark Act, 15 U.S.C. § 1051, et seq. (the Lanham Act), vests jurisdiction in the federal district court inter alia under 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) and (b). Venue is proper in the Northern District of California, because the defendant resides in this district and the acts of trademark infringement occurred here. *See* 28 U.S.C. § 1391(b) and (c). Congress has expressly vested the federal courts with the power to grant injunctions against infringement of a mark registered in the Patent Office and according to principles of equity. *See* 15 U.S.C. § 1116; *see also Visa Int'l Serv. Ass'n v. VISA/Master Charge Travel Club*, 213 U.S.P.Q. 629, 634 (9th Cir.1981).

### A. *Standard for Preliminary Injunctive Relief:*

To meet the Ninth Circuit standards for a preliminary injunction, the plaintiff must demonstrate: (1) probable success on the merits *and* the possibility of irreparable injury; *or* (2) the existence of serious questions going to the merits *and* that the balance of hardships are tipped sharply in his favor. *See Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 723 (9th Cir.1985); *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 523 (9th Cir.1984); *Visa Int'l Serv. Ass'n v. VISA/Master Charge Travel Club*, 213 U.S.P.Q. at 634 (citations omitted). These two standards may appear entirely different, but they are extremes of a single continuum. *See Visa Int'l Serv. Ass'n v. VISA/Master Charge Travel Club*, 213 U.S.P.Q. at 634 (citations omitted). This test governs in trademark infringement cases. *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir.1984); *Miss Universe, Inc. v. Flesher*, 605 F.2d 1130, 1134 (9th Cir.1979). A preliminary injunction is an appropriate remedy for infringement of a registered trademark. *See Visa Int'l Serv. Ass'n v. VISA/Master Charge Travel Club*, 213 U.S.P.Q. at 634 (citations omitted).

### B. *Probable Success on the Merits:*

 In order for the plaintiff to prevail in a case for trademark infringement, the plaintiff must show two basic elements: (1) a valid, protectable mark; and (2) a likelihood of confusion, mistake, or deception in defendant's use of the trademark. *See New West Corp. v. NYM Co.*, 595 F.2d 1194, 1198–1202 (9th Cir.1979). The test for infringement of plaintiff's registered trademark under 15 U.S.C. § 1114, is "... whether the use of the trademark by defendant has been in a manner likely to confuse the public about the origin, sponsorship, or endorsement of defendant's product or service." *Visa Int'l Serv. Ass'n v. VISA/Master Charge Travel Club*, 213 U.S.P.Q. at 635.

As a threshold matter, Schwab has offered proof of the federal registration of THE EQUALIZER as a trademark and a service mark on September 24, 1985; alleges use of the mark as early as February 28, 1985; and alleges heavy monetary investment in the development and promotion of THE EQUALIZER with heavy sales as a result. Defendant argues that unlike a patent or right granted under other federal statutes a federal trademark registration does not entitle the trademark owner to a monopoly over the registered name, but that instead it is "prima facie evidence of registrant's exclusive right to use the registered mark in commerce on the goods or services specified in the registration...." 15 U.S.C. § 1115(a); *see Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir.1985). Defendant contends that therefore any evidentiary effect of

---

has personal knowledge about this testimony pursuant to Rule 602; and (2) that Schwab has failed to show that Randolph is qualified as an expert to offer an opinion about products such as the defendant's home equity line of credit pursuant to Rules 702 and 703. This court denies defendant's motion to strike under Rule 56(e), finding that the plaintiff has laid a foundation sufficient to admit declarant Randolph's testimony as either an expert or a non-expert witness in the field of marketing.

Schwab's registration is strictly limited to the goods described in its registration.[2]

■ The defendant is correct in asserting that the registration cannot be used as prima facie evidence of the plaintiff's exclusive right to use the registered mark when applied to anything other than the items under which it has registered, i.e., other than for computer programs recorded on magnetic media, computer software user's manuals, and provision of access to computer data bases in the field of financial investments. For these goods and services, Schwab's registered trademark is prima facie evidence of the plaintiff's exclusive right. However, this is merely an evidentiary standard and does not mean that the plaintiff does not have a protectable right to its registered mark.[3]

■ The plaintiff has correctly argued that infringement can be found and prohibited even if the use of the registered mark is upon goods having different descriptive properties than those set forth in the registration, and although in consequence there is not actual competition between the parties. *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 151 (9th Cir.1963), *cert. denied*, 374 U.S. 830, 83

S.Ct. 1870, 10 L.Ed.2d 1053 (1963); *see also E. Remy Martin & Co. v. Shaw-Ross Int'l Imports*, 756 F.2d 1525, 1530, *reh'g denied*, 765 F.2d 154 (11th Cir.1985).[4] The rights of the owner of a registered trademark are not limited to protection with respect to the specific goods stated on the certificate, but extend to any goods related in the minds of a consumer in the sense that a single producer is likely to put out both goods. *E. Remy Martin & Co. v. Shaw-Ross Int'l Imports*, 756 F.2d at 1530. The modern rule expands trademark rights to prevent use on related, but noncompetitive goods; and gives the trademark owner protection against use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner: "... thus, when speaking of a 'likelihood of confusion,' this denotes any type of confusion, including: confusion of source; confusion of affiliation; confusion of connection; or confusion of sponsorship." 2 McCarthy, *Trademarks and Unfair Competition* (2d ed. 1984) § 24:3, at p. 166; *see also Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d at 151.[5]

---

2. Defendant also points out that Schwab's mark is registered in three classes: International Class 9, Electrical and Scientific Apparatus; International Class 16, Prints and Publications; and International Class 42, Miscellaneous Services; and that its home equity line of credit does not fall within any of the classes for which Schwab's mark is registered. Defendant notes that the Trademark Examiner in the Patent and Trademark Office rejected Schwab's attempt to register its mark in International Class 36, Insurance and Financial Services. The court would like to note that as the plaintiff suggests, the classification of goods and services is for the convenience of Patent Office administration only and neither limits nor extends the applicant's rights. Such classification is "... immaterial in determining likelihood of confusion, mistake, or deception of purchasers as to source of origin of goods." *In re Knapp-Monarch Company*, 296 F.2d 230, 231 (C.C.P.A.1961); *see also* 15 U.S.C. § 1112.

3. As the *Levi Strauss* court stressed, the plaintiff cannot simply rely on federal registration alone to establish its cause of action; it must also claim under 15 U.S.C. § 1114, which prohibits trademark infringement and applies to marks with federal registration; and under § 1125(a),

which prohibits false designation of origin and is not limited to registered marks. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d at 1354 n. 2. In the instant case, the plaintiff has met these requirements.

4. The Lanham Act of 1946, 15 U.S.C. § 1051 et seq., prohibits use without the registrant's consent "of any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of *any goods or services* on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(a), (emphasis added). As the *Fleischmann* court pointed out, "... the Lanham Act has done away with the old concept of "goods of the same descriptive properties." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d at 152.

5. As plaintiff asserts, the modern "related goods" test is also applied by the Trademark Office under Lanham Act § 2(d) in passing upon the registration of marks initially: registration of an applicant's mark will be refused if it so resembles a previously registered mark or trade name that "... buyers are likely to think

■ Plaintiff has shown that it has a valid, protectable mark which covers goods and services related to those which it is supplying under the name THE EQUALIZER and has met the first criterion to show probable success on the merits. The question then becomes whether or not the defendant's goods are related to the plaintiff's such that there is a likelihood of confusion if the defendant uses the plaintiff's trademark. Because the "related goods" test is merely a facet of the ultimate and final test of "likelihood of confusion"—the second criterion to show probable success on the merits—and because each circuit court of appeals has developed its own version of the test, this court turns now to an analysis of the likelihood of confusion/related goods test developed by the Ninth Circuit. *See,* 2 McCarthy, § 24:6, at p. 183–85.

In *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979), the Ninth Circuit set forth eight factors which are relevant to the likelihood of confusion: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *See also Lindy Pen Co. v. Bic Pen Corp.,* 725 F.2d 1240, 1243 (9th Cir.1984); *Toho Co. v. Sears, Roebuck & Co.,* 645 F.2d 788 (9th Cir.1981).

1. *Strength of the mark:*

■ The strength of the mark determines the standard of protection from infringing uses which a court will apply.

There are three grades of strength, listed here in descending order of protection: (1) a strong mark is inherently distinctive, for example, an arbitrary or fanciful mark, and will be afforded the widest degree of protection; (2) a suggestive mark subtly connotes something about the products, is less distinctive than an arbitrary or fanciful mark, and therefore is a comparatively weak mark, but will be legally protected and registered without proof of secondary meaning; and (3) a descriptive mark tells something about the product and will be protected only when secondary meaning is shown. *See AMF Inc. v. Sleekcraft Boats,* 599 F.2d at 349. The plaintiff asserts that "The Equalizer" is a strong mark, in that it is arbitrary or fanciful; and the defendant argues that the mark is suggestive and weak.

■ Plaintiff's argument that its mark is fanciful is incorrect. A fanciful mark is a "... word which is coined for the express purpose of functioning as a trademark." 1 McCarthy, § 11:2, at p. 435. The word "equalizer" is not a word coined for the express purpose of functioning as a trademark; it is a word found in the dictionary as a noun form of the verb "equalize". Plaintiff cites the dictionary meaning of "equalizer" as a device that provides for equal distribution. The next category for which the plaintiff argues is that the mark is "arbitrary." An arbitrary mark is a mark which "... consists of a word or symbol which is in common usage in the language, but which is arbitrarily applied to the goods or services in question in such a way that it is not descriptive or suggestive." *Id.*[6] For instance, the word "stork"

that the applicant's goods or services come from the same source, or are affiliated with, connected with or sponsored by, the owner of the previously registered or used mark or name." 2 McCarthy, § 24:12, at p. 211; Lanham Act § 2, 15 U.S.C. § 1052(d), and § 23, 15 U.S.C. § 1091. The registration of the plaintiff's mark as an evidentiary factor shows that the Trademark Office did not consider it so related to any other registered mark that it offered a likelihood of confusion with the marks then registered. Plaintiff's registration is for both a trademark and a service mark, which means that plaintiff's scope of protection would extend not only to related goods but also to related services. The

test for infringement of a registered service mark is the same as that for that of trademark infringement: is there a likelihood of confusion? *See Mr. Travel, Inc. v. V.I.P Travel Service, Inc.,* 268 F.Supp. 958 (N.D.Ill.1966), *aff'd per curiam,* 385 F.2d 420 (7th Cir.1967); 2 McCarthy, § 23:23, at p. 116.

6. When an attempt is made to distinguish between arbitrary and suggestive, the task is found to be almost impossible; however, it is a test which usually need not be made because both arbitrary and suggestive marks "... fall within the same legal pigeon hole of classification in

was found to be arbitrary when applied to a nightclub: "it is in no way descriptive of the appellant's night club, for in its primary significance it would denote a club for storks." *Stork Restaurant v. Sahati,* 166 F.2d 348, 355 (9th Cir.1948). Suggestive terms, on the other hand:

> ... shed some light upon the characteristics of the goods, but so applied they involve an element of incongruity, and in order to be understood as descriptive, they must be taken in a suggestive or figurative sense through an effort of the imagination on the part of the observer.

*General Shoe Corp. v. Rosen,* 111 F.2d 95, 98 (4th Cir.1940), *reh'g denied,* 112 F.2d 561, (4th Cir.1940).

Plaintiff argues that the term does not describe the product but does just the opposite: Schwab's promotional literature tells customers to "Give yourself an edge....", and this edge is the ability to acquire an unequal share of profits. However, the phrase may also refer to giving the user the professional traders' edge, that is, to putting the customer on an equal footing with the professional trader. The second page of this brochure states: "The Equalizer gives you the professional's edge." A phrase in another brochure reads, "the Equalizer is the first software product to put you on equal footing with stock market professionals." This court finds that when read in context with the total ad, THE EQUALIZER is a phrase which suggests that the user will be put on an equal footing with a professional broker and as such is a suggestive term.

Defendant argues that extensive third-party use of similar marks, both for related and unrelated goods, further weakens the plaintiff's limited rights. Defendant contends that its trademark search conducted

in October, 1986, disclosed over 40 current or past users of either EQUALIZER or THE EQUALIZER for products ranging from mattresses to manure loaders, including the CBS television show named THE EQUALIZER.

The defendant has offered no evidence beyond citing the registrations and telephone listings of third party users of the trademark. Such citation is not proof of third party *uses* for showing a crowded field and relative weakness of the mark. As one court pointed out: "the existence of these registrations is not evidence of what happens in the market place or that customers are familiar with their use." *Scarves by Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1173 (2d Cir.1976) (citations omitted). The defendant has the burden of showing how extensive the uses are and how long they have continued. *See* 1 McCarthy, § 11:26, at p. 514; *Miss Universe, Inc. v. Little Miss U.S.A., Inc.,* 212 U.S.P.Q. 425 (N.D.Ga.1981).[7] Plaintiff has offered evidence to the effect that there is not a single user of THE EQUALIZER in the financial services industry because any such users have long since abandoned the mark; that there is one insurance company using the mark but the company does not use the mark in dealing with the general public; and that there are only two parties currently using the mark for financial services in the country—plaintiff and defendant. For these reasons, we accord the registration of multiple users in completely unrelated fields of the same or similar trademark, little weight.

The defendant also contends that a consumer survey conducted by the Opinion Research Corporation between February 14–16, 1987, attests to the fact that THE EQUALIZER is an extremely weak mark.

---

that neither category requires proof of secondary meaning for legal protection." *Id.* at p. 440. But because a suggestive mark is entitled to less protection than a strong mark, this court will decide whether the mark is arbitrary or suggestive. *See Alpha Industries v. Alpha Steel,* 616 F.2d 440, 445 (9th Cir.1980).

**7.** If a court gives relevance to such citations, it accords such a list weight when the defendant has provided evidence of use of the trademark

not just citation of the registration mark. *See Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 259–80 (5th Cir.1980), *cert. denied,* 449 U.S. 899 (1980). The defendant has cited the *Domino* case to emphasize the weakness of plaintiff's mark; however, in the *Domino* case, the defendants introduced into evidence some 72 third-party registrations, *and* presented extensive evidence of 15 third-party uses of the trademark from 1885 until the time of the suit. *See id.*

The survey concluded that consumers in the population surveyed associated the words THE EQUALIZER with a wide range of products, that they associated these words with a television show more often than with any other product or service, and that there was virtually no consumer association between Schwab and/or Hibernia and the words. The "survey universe" consisted of a market felt to be common to both parties, those households with an income of at least $35,000 per year. The survey was conducted over the telephone with the head of the household, whether male or female. The interviewers asked each qualified respondent the question: "When I mention 'The Equalizer' what comes to your mind?" If the respondent identified a particular product or service, s/he was then asked to identify the product or service by "kind" and by source. The interviewer then asked the respondent whether s/he identified THE EQUALIZER with anything else, and repeated this process until the associations ended.

This court finds several problems with this survey. The survey universe was skewed: plaintiff has identified its demographics as those who earn more than $50,000 per year and are between the ages of 24 and 54. Further, the issue is not whether a casual observer would confuse the source of the goods, but whether a prospective purchaser would at the time he considered making the purchase. *See American Luggage Works v. United States Trunk Co.*, 158 F.Supp. 50, 53 (D. Mass. 1957). As Judge Wyzanski noted in *American Luggage*, "many men do not take the same trouble to avoid confusion when they are responding to sociological investigators as when they spend their cash." *Id.* The defendant contends that the consumers for both products are sophisticated and take considerable time in making up their minds; therefore, "confusion in the minds of a careless purchaser is not dispositive of the issues in this case." *General Motors Corp. v. Cadillac Marine & Boat Co.*, 226 F.Supp. 716, 739 (W.D.Mich.1964). The series of questions posed by the interviewers is also objectionable: the Fifth Circuit has found that such a procedure degener-

ates "... into a mere word-association test entitled to little weight." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d at 264. Further, the wisdom of conducting such a survey by telephone is questioned as it allows no visual inspection of the trademarks at issue, nor is it conducted in circumstances which replicate those of actual marketing conditions, particularly since Hibernia's product is allegedly offered only at its branches. *See Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208, 211 n. 2 (2d Cir.1985); *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F.Supp. 445, 450–51 (S.D.N.Y.1982). Because of these methodological defects, this court finds that this survey is not substantiating evidence of the weakness of the plaintiff's mark.

We find that the plaintiff's mark is suggestive and weaker than an arbitrary or fanciful mark but entitled to legal protection without evidence of secondary meaning. To establish probable success on the merits, the findings on the remaining relevant factors must weigh on balance in favor of the plaintiff.

### 2. *Proximity of the goods:*

Defendant argues that Schwab's claim is barred as a matter of law because its computer software package is completely different from and unrelated to defendant's home equity line of credit. Plaintiff does not argue that the goods are the same but that they are related goods. Neither the parties nor the court realistically believe that a consumer could confuse a computer software product with a home equity line of credit; what is at issue is the possibility of confusion of association, affiliation, or sponsorship.

This court notes that the use of the name THE EQUALIZER with some wholly unrelated products, goods or services, such as with a manure spreader or with bowling ball inserts, would not possibly cause confusion or mistake, or lead customers to believe that the goods or services offered had any connection with Schwab. Yet there is an area in which the use of the name THE EQUALIZER with products or services which are related to those which

the plaintiff offers could lead to confusion. The definition of related goods is that they are those "... products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *AMF Inc. v. Sleekcraft Boats,* 599 F.2d at 348 n. 10 (citations omitted).

Experts for both parties associate the parties with the financial services industry. The same experts stress that because of the deregulation of the banking industry, there is often no clearcut line between the services offered by one financial institution and those offered by another. Plaintiff alleges that its plans for expansion include the possibility of offering a home equity line of credit. The defendant's ads proclaim that the defendant is an establishment bank with radical notions: "Radical Notions From an Establishment Bank." The plaintiff has offered additional factors which could create confusion in a consumer's mind: Schwab is in the process of being divested by BankAmerica and the publicity about who is financing the sale, hints that a second, unknown, California bank is involved. There is a possibility that the conjunction of the current and intensive advertising campaign by Schwab for THE EQUALIZER and the recent publicity about its divestiture, with the just released advertising campaign by Hibernia for its THE EQUALIZER, could cause a consumer to be confused as to who is offering what, or how the two products or two organizations are related. These factors

lead this court to find that the parties' products are related goods because they are those products which would be reasonably thought by the buying public to come from the same source if sold under the same mark.[8]

3. *Similarity of the marks:*

There is no dispute that both parties use the same mark: THE EQUALIZER is identical in sight, sound, and meaning to THE EQUALIZER. The defendant argues that the use of the mark creates different commercial impressions because both plaintiff's and defendant's advertising materials contain house marks identifying the corporate sponsor.

 To evaluate the similarities of the marks, the marks must be considered as they are encountered in the marketplace; and although similarity is measured by the marks as entities, "... similarities weigh more heavily than differences." *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes,* 616 F.2d 440, 444 (9th Cir.1980). The defendant is correct in asserting that the consistent use of a housemark can reduce the likelihood of confusion. *See AMF Inc. v. Sleekcraft Boats,* 599 F.2d at 351 (citations omitted). It can reduce the likelihood of confusion when the housemark is the more conspicuous mark and serves to indicate the source of origin to the public: the presence of a housemark in conjunction with the trademark alone will not negate the likelihood of confusion. *See id.*[9]

---

**8.** Preliminary injunctions have issued to stop the use of goods more unrelated than these: Rolls-Royce automobiles enjoined "Rolls-Royce" on radio tubes, *see Wall v. Rolls-Royce of America, Inc.,* 4 F.2d 333 (3rd Cir.1925), and successfully opposed "Krolls Royce" on baby buggies, *see Kroll Bros. Co. v. Rolls-Royce,* 126 F.2d 495, 29 C.C.P.A. 897 (1942); "Seventeen" on clothes enjoined by "Seventeen" magazine, *see Hanson v. Triangle Publications, Inc.,* 163 F.2d 74 (8th Cir.1947), *cert. denied,* 332 U.S. 855 (1948); *Triangle Publications, Inc. v. Rohrlich,* 167 F.2d 969 (2d Cir.1948). "Eskimo Kooler" on refrigerator cabinets enjoined "Eskimo Pie"; *see Eskimo Kooler Corp. v. Eskimo Pie Corp.,* 235 F.2d 3 (7th Cir.1956), *cert. denied,* 352 U.S. 953, 77 S.Ct. 328, 1 L.Ed.2d 244 (1956); "Fancee Free" outer garments enjoined by "Fancy Free" undergarments, *see Fancee Free MFg. Co. v. Fancy Free Fashions, Inc.,* 148 F.Supp. 825 (S.D.N.Y.1957);

and "Safeway" eye glasses successfully enjoined by chain food markets. *See Safeway Stores, Inc. v. Safeway Opticians, Inc.,* 68 U.S.P.Q. 332 (1946); *see also Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d at 153 n. 2a, for a further list. Plaintiffs were able to stop television sets from using the trademark LIFE because a consumer might be likely to think that LIFE magazine is somehow vouching for the quality of the TV sets; to stop a company from using YALE for flashlights because someone familiar with YALE locks might think that the flashlights are connected with, or sponsored by the YALE lock company. *See* 2 McCarthy, § 24:3, at p. 168.

**9.** Defendant stresses that Schwab's name is prominently displayed with all the advertising material and that defendant's product displays

After a review of both the visual and transcripts of the auditory advertising materials, this court finds that the overall emphasis in the Hibernia promotional material for its new home equity line of credit is on THE EQUALIZER. The housemark is down-played in Hibernia's brochures and advertisements: the name Hibernia is either in smaller letters and located at the extreme bottom of the ad; or the letters THE EQUALIZER are in bold type and that of Hibernia in regular; or the housemark is completely missing, as in the use of buttons where the only words are THE EQUALIZER. As in the *AMF* case, in the Hibernia promotions THE EQUALIZER is the more conspicuous mark and serves to indicate the source of origin to the public so that the effect of the housemark is negligible. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d at 351. Therefore, the fact that the marks are identical weighs more heavily than the fact that the Hibernia's housemark is present and is an additional factor which tends towards a likelihood of confusion.

### 4. *Evidence of actual confusion:*

Plaintiff does not allege that there has been any evidence of actual confusion. The Ninth Circuit has found that "neither actual confusion nor intent are necessary to a finding of *likelihood* of confusion under the Lanham Act." *New West Corp. v. NYM Co.*, 595 F.2d 1194, 1201 (9th Cir. 1979) (citations omitted). As the AMF court has indicated, proving actual confusion is difficult; and the courts have often discounted such evidence, when proven, because it was unclear or insubstantial. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d at 352. The AMF court concluded that this factor is weighed heavily only "... when

there is evidence of past confusion or, perhaps, when the particular circumstances indicate such evidence should have been available." *Id.* at 353.

This court finds that the plaintiff's immediate action in attempting to stop defendant's use of the plaintiff's registered trademark may have been a contributory factor in rendering a situation in which such evidence is unavailable. The court further finds that this factor is not to be weighed heavily as there were no particular circumstances such that evidence should have been available.

### 5. *Marketing channels used:*

Convergent marketing channels increase the likelihood of confusion. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d at 353. In the *AMF* case, the court found that although different submarkets for marketing were involved, the general class of boat purchasers exposed to the products overlapped. *See id.*

Defendant contends that the marketing channels are distinct: Hibernia markets its THE EQUALIZER through radio and print advertising; Schwab markets its product principally through direct mail advertising. Defendant's testimony was directed specifically to this difference in method; however, defendant's declarations invalidate this argument because they testify to the fact that defendant has contracted with a direct mail advertising agency to develop a direct mail advertising program for THE EQUALIZER home equity line of credit and to date, has expended approximately $30,000, on the development of this program. To the extent Schwab advertises its THE EQUALIZER in print media, defendant argues that it does so through specialized publications intended for investors or

---

its housemark; therefore, the identity of the two marks is lessened, and there is no likelihood of confusion. The defendant cites *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 725 F.2d 1240 (9th Cir. 1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985), to support its contention that the use of a housemark dispels any confusion that might otherwise result from the use of identical marks. The court in *Lindy* noted that the marks in that case were always accompanied by prominent house marks and logos, com-

pared to which the marks in contention were themselves inconspicuous. *See id.* at 1245 n. 4. The *Lindy* court distinguished its case from the *AMF* case, in which the Ninth Circuit found that the use of a house mark and distinctive logo could reduce the likelihood of confusion, but concluded that the effect is negligible where the house mark is inconspicuous and the logo is often absent. This court finds that the instant case is more like the *AMF* case.

computer owners. The defendant maintains that the manner in which the products are sold is also distinct: Schwab through a mail-order application, Hibernia through instructing customers to stop by or phone the bank. The court notes however, that the customers for both fill out application forms.

In examining the exhibits, this court finds that the plaintiff has advertised in such publications as *The Wall Street Journal* and *Barrons*, as well as in computer publications. The former are not necessarily publications limited to computer users, but are aimed at investors and business people in general. Both parties are San Francisco based financial institutions; Schwab has a history of offering financial services in association with a bank, is presently associated with a bank, and has future plans to associate with a bank; a primary market for the plaintiff's product is California and the only market for the defendant's THE EQUALIZER product is California.[10] As to the demographics involved, the plaintiff alleges and defendant's declarations agree, that both parties appeal to a potentially similar market—a class of relatively young and affluent investors.[11] Both products require an upfront fee: Hibernia's requires a fee of $100; Schwab's of $199, or $99 with a discount coupon.

Based on the above information, we find that the customers for both products are fairly affluent; that the geographical area of sales distribution overlaps; that both advertise through or have put money in advertising through the direct mail approach; and that although different submarkets are involved, the general class of consumers exposed to both products overlap. For these reasons, we find that al-though the markets may not be identical, they tend to converge.

**6. *Type of goods and purchaser care:***

Both parties are offering goods which are purchased for an initial fee of approximately $100–200; it has been shown above that the market for the products are similar, i.e. those with incomes at least above $35,000; both parties claim that the likely purchaser is sophisticated and that s/he will buy the goods only upon careful consideration.

The standard used by the courts in assessing the likelihood of confusion is the typical buyer exercising ordinary caution; this standard includes the ignorant and the credulous. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d at 353 (citations omitted). The reasonably prudent person standard may be elevated to the standard of the "discriminating" or "sophisticated" purchaser in a case in which a purchaser is buying expensive goods. *See McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir.1979); 2 McCarthy, § 23:28, at p. 130.

The defendant argues that the consumers buying plaintiff's product are professionals such as doctors, executives, and traders. We would like to point out that these customers may be sophisticated; but they are not experts, except in their own fields, i.e., the doctor might be accorded a greater degree of expertise if he were purchasing a drug than he would be accorded when purchasing the financial services products in the instant case. *See Astra Pharmaceutical Prod. v. Beckman Instruments*, 718 F.2d 1201, 1207 (1st Cir. 1983).[12]

**10.** The plaintiff alleges that 40% of its packages distributed to date have been to California customers and that 40% of these have been to customers in Northern California.

**11.** A survey conducted by Schwab reveals that the purchasers fall between the ages of 25 and 54 and that the majority earn more than $50,000 per year. Defendant states that its customers must own homes with equity sufficient to support a mortgage of from $15,000 to $250,000 and qualify for a line of credit. The article which defendant has submitted in the *Examiner*, cites this type of loan as appealing to "... upscale consumers, who are better credit risks."

**12.** In *Astra*, a pharmaceutical firm, which primarily distributed a drug used as a local anesthetic and antiarrhythmic, brought a trademark infringement action against a defendant using the registered mark on its computerized blood analyzer machine. *See id.* at 1201. The *Astra* court found that the purchasers, anesthesiologists and pharmacists and those in charge of

Sophistication does not preclude a likelihood of confusion. *See E. Remy Martin & Co. v. Shaw-Ross Int'l Imports,* 756 F.2d at 1530. In fact, in the instant case, such sophistication could increase confusion: the consumers of each product are more likely to be aware of the ongoing divestiture of Schwab by BankAmerica and the confusion with regard to its financial backers; they are also more aware of the deregulation and diversification of the financial services industry. When they read the trademark THE EQUALIZER in Schwab's advertisements, they notice that it is registered; therefore, when they see the same trademark in Hibernia's ads, they might assume that there must be some connection between the two. For these reasons, this court finds that this factor also weighs towards a likelihood of confusion as to association, affiliation and sponsorship of the product, regardless and perhaps because of the sophistication of the consumers.

### 7. *Intent:*

The intent of a defendant in selecting and using the trademark of another is relevant in determining that a likelihood of confusion exists and that plaintiff is likely to succeed on the merits at trial. *See Visa Int'l Serv. Ass'n v. VISA/Master Charge Travel Club,* 213 U.S.P.Q. at 635 (citations omitted). The defendant claims that it was unaware of Schwab's use of the trademark when it adopted the mark on the advice of its ad agency. Although a presumption of intent may arise when, as here, a party adopts a virtually identical trademark when other phrases are available and continues its use after receipt of notice of the trademark owner's rights and objections, we find it unnecessary to address this issue in light of the Ninth Circuit holding that neither actual confusion nor intent are necessary to a finding of the *likelihood* of confusion under the Lanham Act. *See New West Corp. v. NYM Co.,* 595 F.2d at 1201; *see Visa Int'l Serv. Ass'n v.*

*VISA/Master Charge Travel Club,* 213 U.S.P.Q. at 635; *Sierra On-Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1423 (9th Cir.1984).

### 8. *Likelihood of expansion:*

Because a trademark owner is afforded greater protection against competing goods, when there is a "strong possibility" that either party may expand his business to compete with the other, that factor will weigh in favor of finding that the present use is infringing. *See AMF Inc. v. Sleekcraft Boats,* 599 F.2d at 354. The AMF court found that when goods are closely related, "... any expansion is likely to result in direct competition." *Id.* The plaintiff contends that expansion of its services is underway: it offers lines of credit; it has devoted research to going into a partnership with a bank or savings and loan to market home equity loans; it offers credit cards, debit cards, and checks through various banks; and it plans to offer secured and unsecured loans through THE EQUALIZER.

Defendant contends that it is unlikely that consumers will believe that Schwab would expand to a home equity line of credit under THE EQUALIZER trademark and that it would be difficult for the plaintiff to expand the package to allow customers to apply for insurance products. Defendant argues that this would be unlawful because the Lumbermans Mutual Casualty Company has a registration for Equalizer in connection with "underwriting disability insurance." However, plaintiff has offered evidence to the effect that the consumer relations department of the cited company has no knowledge of any insurance product available through the company called "Equalizer", that the only product similar in name was a group health insurance plan called "The Economizer." As plaintiff has suggested, because of its unique position with regard to its divestment by BankAmerica, its history of offering various servic-

---

the chemistry lab, such as pathologists and chemists, were highly trained to recognize the differences in the products; furthermore, the markets of the two parties never converged, i.e.,

the defendant only sold its machines to hospital chemical labs and never to the pharmacy or to anyone who used plaintiff's drugs.

es in association with various banks, and the current deregulation of the banking industry into many areas, it is not unlikely that a consumer would believe that the plaintiff would expand into these areas.

With plaintiff's plans for expansion before us, the potential that the plaintiff will enter the defendant's submarket in the financial services industry is strong and thus the potential for future competition increases. This factor weighs in favor of finding that defendant's use is infringing.

Having reviewed all the standards which the Ninth Circuit has set up to establish likelihood of confusion, this court finds that the weight of the findings goes toward the likelihood of confusion; therefore we find that the plaintiff has shown probable success on the merits. The plaintiff need only now show the possibility of irreparable injury.

### C. *The Possibility of Irreparable Injury:*

■ The purpose of a preliminary injunction is to preclude irreparable injury pending a final determination of the case, by preserving the status quo between the litigants. *See Visa Int'l Serv. Ass'n v. VISA/Master Charge Travel Club,* 213 U.S.P.Q. at 635 (citations omitted). A showing of reasonable likelihood of success on the merits in a trademark infringement claim raises a presumption of injury. *See International Olympic Comm. v. San Francisco Arts,* 219 U.S.P.Q. 982, 986 (N.D.Cal.1982); *Apple Computer, Inc. v. Formula Int'l, Inc.,* 725 F.2d 521, 525 (9th Cir.1984). Once this showing has been made, a court may reasonably conclude that continuing infringement would result in loss of control over Schwab's reputation and loss of goodwill. *See Apple Computer, Inc. v. Formula Intern., Inc.,* 725 F.2d at 526 (citations omitted).

The plaintiff has also introduced evidence of the investment of three million dollars in planning its advertisement campaign, and the proposed investment for the year of 1987, of another 1.4 million. The plaintiff has developed its product for two years. Plaintiff also argues that it has a right to avoid having its reputation placed

in jeopardy: the product which the defendant is offering under THE EQUALIZER, a home equity line of credit, is new and controversial. The defendant has introduced articles which stress that investors can make serious financial mistakes in investing in taking out this type of credit; plaintiff does not want the possibility of association with its institution to occur if customers are unhappy with the results of having invested in this type of credit.

Defendant's losses were incurred over a short period of time, approximately six months. Defendant asserts that it would be irreparably damaged by an injunction because it would lose the ability to offer a home equity line of credit identifiable to consumers. The court finds this consumer identity difficult to reconcile with the fact that Hibernia's promotional campaign for THE EQUALIZER has only been ongoing since January 20, 1987, and was restrained by this court on February 11, 1987. It is also irreconcilable with the fact that the defendant has been offering a home equity line of credit under another name since May, 1986. Defendant alleges that it will stand to lose more than $690,000, in its promotional and creative efforts, the enthusiasm and high motivation of its sales force, which it took six weeks to build, and the competitive edge on the new home equity credit line market. When compared to the past and future efforts of plaintiff in conjunction with the marketing of its THE EQUALIZER, this court finds that the use by defendant of THE EQUALIZER presents a possibility of irreparable harm to the plaintiff and its reputation and that the balance of hardships tips sharply in favor of the plaintiff. For these reasons, the balance of equities also tips in favor of the plaintiff in a manner appropriate for injunctive relief.

### CONCLUSION

This court grants plaintiff's motion for a preliminary injunction on the grounds that plaintiff has shown both probable success on the merits and the possibility of irreparable injury, and that the balance of hard-

ships and of equities tips in favor of the plaintiff.

SO ORDERED.

### PRELIMINARY INJUNCTION

On March 3, 1987, this court issued an opinion granting plaintiff's motion for a preliminary injunction. It is HEREBY ORDERED that pursuant to that opinion:

1. Defendant Hibernia Bank ("Hibernia") refrain from undertaking any new advertising campaigns using the phrase THE EQUALIZER or any substantially similar phrase in connection with any of its products;

2. Defendant Hibernia refrain from having its employees wear any pins or buttons with the phrase THE EQUALIZER or any substantially similar phrase;

3. Defendant Hibernia cease displaying any signs or posters in its branches or offices bearing the phrase THE EQUALIZER or any substantially similar phrase;

4. Defendant Hibernia cease using any radio or television or newspaper advertisements using the phrase THE EQUALIZER or any substantially similar phrase; and,

5. Defendant Hibernia, its agents, employees, partners, servants, and attorneys, are preliminarily enjoined from advertising, marketing, or selling in any other way, any product or service using the mark THE EQUALIZER or any substantially similar phrase, pending the final disposition of this case.

It is FURTHER ORDERED that this preliminary injunction is hereby conditioned upon plaintiff's filing with the Clerk of this court by no later than 5:00 p.m. on March 5, 1987, an undertaking in the form of a bond, certified, cashier's, or attorney's check or cash, in the amount of $50,000, to secure the payment of such costs and damages not to exceed such sum as may be suffered or sustained by any party who is found to be wrongfully enjoined.

IT IS SO ORDERED.