**E. REMY MARTIN & CO., S.A., Plaintiff-Appellant,**

**v.**

**SHAW-ROSS INTERNATIONAL IMPORTS, INC., and Roger Myers d/b/a F. Remy & Cie, Defendants-Appellees.**

**No. 84-5212.**

United States Court of Appeals, Eleventh Circuit.

April 8, 1985.

Rehearing and Rehearing En Banc Denied June 6, 1985.

Joel M. Freed, Burns, Doane, Swecker & Mathis, R. Danny Huntington, Alexandria, Va., Hugo L. Black, Jr., Kelly, Black, Black, Byrne & Beasley, P.A., Richard M. Bales, Jr., Miami, Fla., for plaintiff-appellant.

James V. Johnstone, Coral Gables, Fla., for defendant-appellee Shaw-Ross Intern. Imports, Inc.

Thomas Marsteller, Payne-Marsteller, P.C., Houston, Tex., for defendant-appellee R. Myers.

Before HILL, KRAVITCH and SMITH *, Circuit Judges.

* Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

EDWARD S. SMITH, Circuit Judge:

In this trademark infringement case, plaintiff-appellant E. Remy Martin & Co., S.A. (Remy Martin), appeals from an order of the United States District Court for the Southern District of Florida, denying Remy Martin's request for a preliminary injunction against alleged trademark infringers, defendants-appellees Shaw-Ross International Imports, Inc. (Shaw-Ross), and Roger Myers d/b/a F. Remy and CIE (Myers). We reverse and remand.

*Background*

Remy Martin is a French company which has been in the business of distilling and marketing cognac and brandy since 1724.[1] Cognac and brandy are distillates of wine, with cognac being brandy distilled from wine made from grapes grown in a particular part of France. Since at least 1884 Remy Martin has distributed its cognac in the United States. It markets its products here under three United States registered trademarks: REMY MARTIN for cognac, registered 1963, claiming use since 1884; ST. REMY for brandy, registered 1976, claiming use since 1972; and REMY for brandy, registered 1981, claiming use since 1979.

Myers is an American who has been in the wine business since 1935. In 1947 he began exporting wines from France, including a sparkling wine labeled F. REMY, with the name REMY alone on the closure of the bottle. The trademark F. REMY was registered in France in 1947, renewed in 1968 to cover wines, spirits, and liquors, and renewed in 1978 for wines only. In 1970 in France, Myers agreed with Remy Martin that he would renounce rights in the name F. REMY for spirits and liquors and restrict his use to wines only. Myers registered the trademark F. REMY in the United States in 1957 for wine and champagne. The registration lapsed after its statutory term expired in 1977,[2] and in 1981 Myers retained a new attorney with the objective of again securing registration of the mark in the United States.

Shaw-Ross imports and distributes in the United States, among other products, Myers' wines from France under the F. REMY label. Myers designated Shaw-Ross his importer in December 1982.

Toward the end of the 1970's Remy Martin began a massive advertising campaign to realize the full potential of the American market. The campaign, capitalizing upon the perceived public recognition of the nickname "Remy" for REMY MARTIN cognac, was launched for the 1979 Christmas season and cost many millions of dollars. As a result, Remy Martin's United States sales and market share greatly increased.

Myers exported F. REMY wines to the United States from 1947 to 1976 in an amount which is disputed, but which is very small compared to Remy Martin's United States sales during this period. It is undisputed that Myers terminated his F. REMY shipments to the United States from 1976 through all or most of 1981, or approximately 6 years, a period coinciding with the lapse of his United States F. REMY trademark registration. Myers revived shipments to the United States in the latter part of 1981 or early 1982. Total 1982, 1983, and planned 1984 shipments equal roughly three-quarters of Myers' total shipments for the 1947–76 period, assuming the higher disputed figure.

In December 1983 Remy Martin filed suit in the court below for trademark infringement, unfair competition, or dilution and moved for a preliminary injunction. For 1 week in January 1984 a magistrate heard testimony and took evidence. On March 5, 1984, the court below issued the order here under appeal, denying Remy Martin's request for a preliminary injunction.

1. *See E. Remy Martin & Co. v. Shaw-Ross Int'l Imports, Inc.,* No. 83–3139–CIV–JE (S.D.Fla. Mar. 5, 1984). We have drawn from the lower court's findings as set forth in the order and the record before us in stating the background. Of course, as the court below stated in its order, findings made on an application for a preliminary injunction are not controlling at a later hearing on a permanent injunction.

2. 15 U.S.C. § 1058(a) (1982).

OPINION

1. *Standard of Review*

This court reviews the district court's denial of a preliminary injunction to determine whether that court abused its discretion.[3] If the lower court has misapplied the law, its conclusions are subject to our broad review. Factual findings, however, will be reversed only if clearly erroneous.[4]

The Lanham Act [5] provides that any person who shall, without the consent of the registrant, use in commerce any registered mark in connection with which "such use is likely to cause confusion, or to cause mistake, or to deceive * * * shall be liable * * * for the remedies [including injunctive relief] hereinafter provided." [6] In this circuit a determination of likelihood of confusion, mistake, or deception is a matter of fact that we may overturn only if clearly erroneous.[7] However, if the trial court has misapplied the law, then this court must review and correct the error without deference to that court's determination regarding the legal issue.[8]

2. *Errors of Law*

Our review of the district court's opinion uncovers four errors of law, discussed as they arise below and summarized here. That court: (1) wrongly held Remy Martin to a showing of actual, as opposed to likelihood of, confusion; (2) wrongly required evidence of actual confusion as proof of the irreparable harm necessary to grant a preliminary injunction; (3) wrongly considered the status of the allegedly infringing mark under foreign trademark law; and (4) wrongly considered or ignored the statutory presumption of abandonment.

3. *Substantial Likelihood that Remy Martin Will Prevail on the Merits—i.e., Show Likelihood of Confusion*

The trial court held that: [9]

> While this Court does not determine that the plaintiff [Remy Martin] will not prevail on the merits, it does not find at this point in the case that there is substantial likelihood that the plaintiff will prevail on the merits. It has not been shown that irreparable injury will result if preliminary injunction is not granted.

In arriving at this conclusion, that court found: "No evidence has been presented to show actual confusion between the use of the two trademarks Remy or Remy Martin as applied to cognac brandies, and Remy or F. Remy as applied to wines or sparkling wines." [10] It further held that: "A possible confusion, as may be feared, does not within itself give rise to irreparable damage." [11]

The law is well settled in this circuit that evidence of *actual* confusion between trademarks is not necessary to a finding of *likelihood* of confusion, although it is the best such evidence.[12] This rule is grounded in the statutory language

3. *Buchanan v. United States Postal Serv.*, 508 F.2d 259, 266 (5th Cir.1975). This circuit adopted the case law of the Fifth Circuit through September 30, 1981. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209–11 (11th Cir.1981).

4. *Buchanan*, 508 F.2d at 267 n. 24.

5. 15 U.S.C. §§ 1051 *et seq.*

6. *Id.*, § 1114(1)(a).

7. *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1163 (11th Cir.1982); FED.R.CIV.P. 52(a).

8. *See, e.g., Chevron Chem. Co. v. Voluntary Purchasing Groups*, 659 F.2d 695, 703 (5th Cir. 1981), *cert. denied*, 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982); *cf. Sun Banks v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 314 (5th Cir.1981), cautioning that the "clearly erroneous" standard may not be eroded when reviewing a likelihood of confusion issue, by asserting that the district court labored under "misapprehension concerning the governing legal norms." *See also Safeway Stores, Inc.*, 675 F.2d at 1164 n. 3.

9. *E. Remy Martin & Co.*, order at 7.

10. *Id.* 6.

11. *Id.*

12. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 978 (11th Cir.1983).

and applies as well in the context of a preliminary injunction, where showings of substantial likelihood of prevailing on the merits and substantial threat of irreparable harm are the first two of the four tests to be satisfied to obtain such relief.[13] This means that a sufficiently strong showing of likelihood of confusion may by itself constitute a showing of substantial likelihood of prevailing on the merits and/or a substantial threat of irreparable harm.[14]

The district court has erred on both these points of law, to the best we are able to discern from its order. Given such apparent errors, we must re-examine the record and findings below and apply the law correctly. In doing so, we make use of the various elements helpful in determining likelihood of confusion, as identified by this circuit in numerous trademark cases.[15] We reserve judgment until concluding our analysis of these factors, when we can weigh them as a whole, and then determine whether there exists a substantial likelihood of Remy Martin's prevailing on the merits.

a. *Similarity of Product.*

The lower court found that "[t]he *products* [wine as compared to cognac or brandy], to the drinking world, are dissimilar." [16] The question, however, is not whether the purchasing public can readily distinguish wine from cognac but whether the products are the kind the public attributes to a single source. As our predecessor court has noted, "[t]he greater the similarity between the products and services, the greater the likelihood of confusion." [17] Moreover, the rights of the owner of a registered trademark are not limited to protection with respect to the specific goods stated on the certificate—for Remy Martin, cognac and brandy—but extend to any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods.[18]

Here, Remy Martin's products, cognac and brandy, are distilled from Myers' type of product, wine. To us it appears quite likely that, even assuming a sophisticated consumer from the drinking world, such a consumer could easily conclude that Remy Martin had undertaken the production and sale of wine and that its name and goodwill therefore attached to Myers' product, both products originating in France. Contrary to the lower court's finding, there is thus a high degree of similarity between the goods.[19]

13. The four factors are: (1) substantial likelihood that plaintiffs will prevail on the merits; (2) substantial threat that plaintiffs will suffer irreparable injury if interlocutory injunctive relief is not granted; (3) threatened injury to plaintiffs outweighs threatened harm injunction may do to defendants; and (4) whether granting preliminary injunction will disserve the public interest. *Buchanan,* 508 F.2d at 266.

14. *See, e.g., Southern Monorail Co. v. Robbins & Myers, Inc.,* 666 F.2d 185, 187–88 (5th Cir.1982), and district court (especially, Southern District of Florida) cases cited therein. The district court cases held that irreparable injury could be presumed as a matter of law where a substantial likelihood of success on the merits, due to a showing of likelihood of confusion (and hence trademark infringement) was established. In *Southern Monorail* the Fifth Circuit declined to rule on the issue, since it disposed of the case on the balance of harm question. *Id.,* 666 F.2d at 187–88. *See also* 2 J. McCARTHY, TRADEMARKS AND UNFAIR COMPETITION, § 30.18 (2d ed. 1984).

15. *John H. Harland Co.,* 711 F.2d at 972–80. These are not statutory elements, but rather are factors identified by this circuit and the former Fifth Circuit in various trademark cases. They include the type of trademark, the similarity of design, the similarity of the product, the identity of retail outlets and purchasers, the similarity of advertising media used, defendants' intent, and actual confusion. *Id.* at 972 and cases cited therein. Since the district court did not make explicit findings on these points, we discuss them, and other points, as they are useful, beginning with those most easily addressed in this case.

16. *E. Remy Martin & Co.,* order at 6.

17. *Exxon Corp. v. Texas Motor Exch.,* 628 F.2d 500, 505 (5th Cir.1980).

18. *American Foods, Inc. v. Golden Flake, Inc.,* 312 F.2d 619, 623 (5th Cir.1963).

19. *Cf. Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149 (9th Cir.), *cert. denied,* 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963) (holding that "Black & White" trademark for scotch whiskey was infringed by use on beer).

b. *Similarity of Design or Marks.*

The lower court found that, from 1981 on, Roger Myers exported sparkling wines to the United States "under the brand 'F. Remy' or 'Remy' but with labels and bottles distinctively different from Remy or Remy Martin cognac bottles and labels." [20] It further found that: [21]

> The bottles or containers as admitted in evidence are distinct in their type and composition—the Remy or Remy Martin cognac bottle being a black frosted round hippy bottle with a gold label, and the F. Remy or Remy wine bottle being a multi-flowered champagne or sparkling wine type bottle.

In evaluating the similarity of marks, we must consider the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed.[22] For example, we note that the *display* of the marks on bottles generally shaped alike and in most instances the same color (green) is not so distinctive as to cause a consumer to examine carefully the printed marks and their differences. We also emphasize the fact of record that the Roger Myers' bottle includes the mark REMY per se on the label sealing the neck of the bottle. The F. REMY mark is *nearly* identical and REMY *is* identical to Remy Martin's registered REMY mark, upon which is based its multimillion dollar advertising campaign. This may be particularly important where, as testimony in the record here shows, much REMY MARTIN cognac or brandy is consumed by the glass at bars or restaurants, where a consumer simply orders a "Remy." Moreover, none of the marks include any broad generic terms; but consist of precise, specific, and personalized names. Thus, we conclude that the slightly different labeling displays surrounding the mark will have little impact on the consuming public.

c. *Use of the Mark Abroad.*

The trial court found that Remy Martin had known for more than 13 years of the F. REMY mark and its use on wine.[23] It further found that Remy Martin, sometime prior to 1970, agreed to Myers' retaining F. REMY as its registered trademark in France for wines, and that there are about 10 or 12 registrations of others in France for marks incorporating the name Remy.[24]

Our review of the record causes us no quarrel with these findings. We do hold that the district court erred as a matter of law to the extent it relied upon Remy Martin's knowledge of Myers' use in France and upon the 1970 agreement concerning Roger Myers limiting the use of his mark in France to wines. Like an earlier Battle of the Brandywine, this skirmish must be fought in this country, notwithstanding the presence of a French connection. Our concern must be the "business and goodwill attached to United States trademarks, not French trademark rights under French law." [25] We assume no knowledge of French trade-mark law and the legal and circumstantial reasons for Remy Martin's 1970 agreement—an agreement made years before Remy Martin realized the common use of and registered the nickname REMY in the United States and spent millions in this country to promote that mark. More importantly, we are not bound to recognize or rely upon foreign law and disagreements abroad settled under it. "[W]hen trade-mark rights within the United States are being litigated in an American court, the decisions of foreign courts concerning the respective trademark rights of the parties are irrelevant

**20.** *E. Remy Martin & Co.,* order at 4.

**21.** *Id.* at 6.

**22.** *John H. Harland Co.,* 711 F.2d at 975.

**23.** *E. Remy Martin & Co.,* order at 6.

**24.** *Id.* at 3–4.

**25.** *Roger & Gallet v. Janmarie, Inc.,* 245 F.2d 505, 510 (CCPA 1957). *See also A. Bourjois & Co. v. Katzel,* 260 U.S. 689 (1923).

and inadmissible." [26] We therefore exclude the status of Roger Myers' mark in France under French law from this case, which concerns rights in a mark under our law.

d. *Identity of Retail Outlets and Purchasers.*

So far as is apparent from the record, both F. REMY wine and REMY/REMY MARTIN brandies/cognac are sold through identical retail outlets—wine and liquor stores, bars, and restaurants—and to identical purchasers—consumers of alcoholic beverages.

e. *Similarity of Advertising Media Used.*

Remy Martin's REMY nickname advertising campaign used extensive media resources—billboards, magazines, and the like. Myers testified that he spent no money on advertising, although his importer did promotions. The record shows a large color advertisement for F. REMY sparkling wines, "La Rose" and "Anniversaire," with the two flowered bottles in ice and the slogan "Say it with flowers from France."

f. *Myers' Intent; Abandonment.*

The record reflects no evidence of Roger Myers' subjective intent to adopt the REMY mark to derive the benefit of Remy Martin's reputation. Indeed, his counsel contends the opposite—that Remy Martin encroached upon Roger Myers' goodwill and reputation. However, a closely related issue regarding intent—abandonment—needs to be addressed here.

The district court found: [27]

> From 1976 to 1980, due to complications in France and reorganization of his business, redesigning of bottles and packaging, and his waiting for his agent Sanford M. Lord to re-establish himself, Roger Myers discontinued exports to the United States. However, Roger Myers has not abandoned intentions of exporting to the United States, nor has he ever intended to abandon his trademark in the United States.

Since it is undisputed that Myers did not use his mark in the United States for approximately 6 years, Remy Martin made out at least a prima facie case of abandonment.[28] The burden of proof then shifted to Myers to demonstrate that circumstances did not justify the inference of intent not to resume use.[29] The court below erred as a matter of law in not articulating and applying this rule.

Myers must therefore show plans to resume commercial use of the mark.[30] The record is extremely weak on such plans. For example, Myers let his mark expire in 1977 and did nothing about it until 1981. A businessman intending to resume commercial use of his mark would or should not allow such a long lapse to occur. Moreover, the record at this point is bare of any attempts by Myers to submit affidavits and the like such as might be expected of one attempting to maintain registration despite nonuse.[31] Myers con-

26. *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 639 (2d Cir.), *cert. denied*, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956).

27. *E. Remy Martin & Co.*, order at 3.

28. Under the Lanham Act, to which we refer for guidance, the following definition of abandonment is provided (15 U.S.C. § 1127):

"A mark shall be deemed to be 'abandoned'—

"(a) When its use has been discontinued with *intent not to resume.* Intent not to resume may be inferred from circumstances. *Nonuse for two consecutive years shall be prima facie abandonment.*" (Emphasis supplied.)

29. *Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 99 (5th Cir.1983).

30. *See, e.g., Miller Brewing Co. v. Oland's Breweries [1971] Ltd.*, 548 F.2d 349 (CCPA 1976), affirming the Trademark Trial & Appeal Board's finding that, despite a Canadian company's ceasing beer shipments to the United States for several years, intent to resume use was found where the company continued actively to advertise in United States magazines and on United States radio, renewed its Massachusetts license to sell beer during this time, and made offers to sell in the United States.

31. *See, e.g.*, 15 U.S.C. § 1058(a) concerning the filing of an affidavit of continuing use with the U.S. Patent & Trademark Office in certain circumstances.

tends before this court that during this period he was constantly in touch with his agent, Sanford Lord, working on changing the concept of his packaging to the stenciled flower bottle, and reorganizing his business. Support in the record, however, is slim. We have only Myers' and his wife's word that abandonment was not his intention. Mr. Lord did not testify. There is testimony from Mr. and Mrs. Myers about a meeting with Lord in Florida the summer of 1978, and the ordering of wine labels in France during this period. However, this evidence, while perhaps sufficient to find the negative intent not to abandon, as did the district court, is insufficient, at this preliminary stage, to establish an affirmative intent to resume use where a prima facie case of abandonment has been made.[32]

g. *Actual Confusion.*

As stipulated, there is no evidence of actual confusion in this case.

h. *Type of Trademark.*

Finally, a factor helpful in determining likelihood of confusion is whether the registrant has a "strong" or a "weak" mark.[33] One aspect of this is the extent of third-party use of the mark.[34] The district court found that 10 or 12 registrations in France are for marks including the word "Remy," but, as we have discussed, this is irrelevant to our dispute concerning United States rights. The court made no finding concerning, and counsel has not highlighted here, third-party use of any marks incorporating REMY in the United States.

A second aspect of this point is whether the mark is purely fanciful or arbitrary, and hence "strong," as opposed to descriptive and hence "weak."[35] While at one time REMY MARTIN and F. REMY were both registered simultaneously, trademark rights are not static. Remy Martin has now built up rights in REMY during Myers' virtual absence from the market. Thus Remy Martin's marks appear to us to be a strong identification of source by virtue of long use and extensive promotion.

To conclude, we must weigh all the factors discussed above before finding if the court below erred in finding no substantial likelihood of Remy Martin's showing likelihood of confusion. In our view, the products—wine as compared to cognac or brandy—are closely related, and the marks, while affixed to bottles and labels differing somewhat in design or shape, are highly similar or identical—F. REMY or REMY as compared to REMY MARTIN, ST. REMY, or REMY. The use of Roger Myers' mark in France is irrelevant to this proceeding. Retail outlets and purchasers are similar; little evidence exists on similarity of advertising media. Roger Myers does not appear to us, at this stage, to have rebutted the statutory presumption of abandonment by affirmatively showing intent to resume use in the United States prior to 1982. Finally, Remy Martin's marks appear to be strong.

Taking all this together, we conclude that Remy Martin has made a strong showing of likelihood of success in establishing infringement.

4. *Granting the Preliminary Injunction*

Having found both numerous errors of law in the district court's order and that it erred in not finding a substantial likelihood of Remy Martin's showing likelihood of confusion, we must determine if the court abused its discretion in not granting the preliminary injunction. Concerning the first two of the four factors that must be considered prior to granting such an injunction—substantial likelihood of prevailing on the merits and substantial threat

32. *See Exxon Corp.*, 695 F.2d at 102–03, articulating this distinction.

33. *John H. Harland Co.*, 711 F.2d at 973.

34. *Id.* at 974.

35. *Id.*

of irreparable injury—our discussion above, concluding that significant likelihood of prevailing on the merits does exist, is sufficient to satisfy the second of these two criteria.[36] Regarding the fourth factor, whether granting the injunction will disserve the public interest, nothing in the record indicates that such disservice would occur if the United States public were barred from further purchase of wines bearing the marks F. REMY/REMY until this case proceeds to full trial and determination.

This leaves the third factor, balancing whether the threatened harm to Remy Martin outweighs the threatened harm which the injunction may do to Roger Myers and Shaw-Ross, to be considered. The district court made no finding on this point, since it found negatively on the first two factors of the preliminary injunction. Remy Martin, which carries the burden of persuasion on each of these four points,[37] has shown, as we have found, that the likelihood of confusion between its marks and Roger Myers' threatens harm to Remy Martin's goodwill and reputation. The only evidence on the record indicating the harm an injunction would bring to Roger Myers is his self-serving statement that such an injunction would put him out of business. However, as Remy Martin points out, Roger Myers' business survived at least 5 years without exporting F. REMY wines to the United States. Moreover, Myers' testimony indicates that Myers' sales of wine brands other than F. REMY far exceed those under the F. REMY name. It would appear that the goodwill Myers has built up in the use of his mark is limited, as opposed to the goodwill in the products themselves. It thus appears clear to us that Remy Martin has carried its burden of persuasion on this factor. The same conclusion applies to Shaw-Ross, which imports wines other than the F. REMY wines.

In sum, for the reasons discussed above, we hold that the trial court abused its discretion in not granting the preliminary injunction. As has been well stated: [38]

> [A] preliminary injunctive decree * * * is sometimes an act of kindness to the party enjoined. It cuts him off from a business life which, from all the portents, would involve a series of trademark frustrations.

### 5. *The State Dilution Claim*

Remy Martin also contends that the district court abused its discretion in failing to address Remy Martin's claim of entitlement to a preliminary injunction under Florida's anti-dilution law.[39] We need not rule nor remand on this claim, however, in view of our finding above that the preliminary injunction obtains based on the Lanham Act claim.[40]

Accordingly, the order of the court below is reversed, and the case is remanded for entry of a preliminary injunction consistent with this opinion.

REVERSED AND REMANDED.

**36.** *See* note 14, *supra.*

**37.** *Southern Monorail Co.,* 666 F.2d at 186.

**38.** *Geo. Washington Mint, Inc. v. Washington Mint, Inc.,* 349 F.Supp. 255 (S.D.N.Y.1972), cited in 2 J. McCARTHY, § 30.15.

**39.** FLA.STAT.ANN. § 495.151 (West 1984).

**40.** *See Community Fed. Sav. & Loan Ass'n v. Orondorff,* 678 F.2d 1034, 1037 (11th Cir.1982), explaining that dilution applies "for a product so dissimilar from the product of the prior user that there is no likelihood of confusion of the products or sources."