Charles W. CLAYTON, Jr., W. Malcolm
Clayton, and Orlando Executive Park,
Inc., Plaintiffs,

v.

HOWARD JOHNSON FRANCHISE SYS-
TEMS, INC., Howard Johnson Compa-
ny, Inc., Marriott Corporation and
Marriott Family Restaurants, Inc., De-
fendants.

No. 87–569–Civ–Orl–19.

United States District Court,
M.D. Florida,
Orlando Division.

July 27, 1988.

**1554**

Robert A. White, Arnold, Matheny & Eagan, P.A., Orlando, Fla., for Charles W. Clayton and Orlando Executive Park, Inc.

Leon H. Handley, Gurney & Handley, Orlando, Fla., for Charles W. Clayton and W. Malcolm Clayton.

Frank R. Jakes, Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A., Tampa, Fla., for Howard Johnson Franchise and Howard Johnson Co., Inc.

Mary A. Lau, Lau, Lane Pieper & Asti, P.A., Tampa, Fla., for Marriott Corp. and Marriott Family Restaurants, Inc.

## ORDER AND PRELIMINARY INJUNCTION

FAWSETT, District Judge.

This case is before the Court upon various pending motions. After careful consideration, the Court determines these matters as follows:

1. Defendant/Counter–Plaintiff's Howard Johnson Company, Inc.'s ("HJCI") Motion to Strike Affirmative Defenses, filed March 15, 1988 (Doc. No. 56), and the Plaintiffs' Memorandum in Opposition, filed March 21, 1988 (Doc. No. 57).

The Court will treat the Motion as a motion for partial summary judgment. The Court will take the Motion under advisement on August 15, 1988. Until that date, the parties may file affidavits and other documents within the purview of Federal Rule of Civil Procedure 56 in support of or in opposition to the Motion. A hearing will not be held on the Motion. Failure to oppose the Motion for Summary Judgment may result in judgment for movant without further proceedings. *See Milburn v. United States,* 734 F.2d 762 (11th Cir.1984); *Griffith v. Wainwright,* 772 F.2d 822 (11th Cir.1985).

2. Defendant/Counter–Plaintiff HJCI's Renewed Motion for Preliminary Injunction, filed November 10, 1987 (Doc. No. 38), and the Plaintiffs/Counter–Defendants Memorandum in Opposition, filed November 23, 1987 (Doc. No. 44). In its Motion, HJCI relies on the Affidavit of Earnest L. Ackley, III, filed November 10, 1987 (Doc. No. 40), the Affidavit of Dave Westerman, filed November 20, 1987 (Doc. No. 43), the Affidavit of Page M. Willner, filed January 26, 1988 (Doc. No. 52), and on the following materials submitted in support of its original Motion for Preliminary Injunction: the Memorandum of Law filed August 26, 1987 (Doc. No. 19), the Affidavits filed August 26, 1987, of David A. Simon (Doc. No. 21), Charles R. Clack (Doc. No. 22), and Joseph D. Milone (Doc. No. 23), the supplemental Affidavits filed October 2, 1987, of David A. Simon (Doc. No. 32), and Charles R. Clack (Doc. No. 33), the Supplemental Memorandum of Law submitted October 2, 1987 and filed November 3, 1987 (Doc. No. 37), and the evidence admitted at the Hearing on October 9, 1987, in reference to the original motion. Plaintiffs rely on the Supplemental Affidavit of W. Malcolm Clayton, filed November 23, 1987 (Doc. No. 46), and on the following materials submitted in opposition to the original Motion for Preliminary Injunction, filed September 22, 1987: the Memorandum of Law (Doc. No. 26), and the Joint Affidavit of Charles W. Clayton, Jr. and W. Malcolm Clayton (Doc. No. 28).

In the Renewed Motion, HJCI requests that the Court enjoin the Plaintiffs from infringing HJCI's registered and unregistered servicemarks (collectively referred to as HJCI's "marks"). Plaintiffs formerly operated a Howard Johnson's Motor Lodge under a License Agreement entered into on January 29, 1965. Subsequently the Plaintiffs became dissatisfied with the relationship and sought to terminate it. Plaintiffs allege the Defendants breached the License Agreement in several material matters.

In May of 1987 Plaintiffs filed this lawsuit in state court seeking a declaratory judgment concerning their rights and obligations under the License Agreement and also a rescission of that Agreement. Defendants removed the case to this Court on June 18, 1987, and answered that same day. On July 20, 1987, the Defendants filed a counterclaim (Doc. No. 11), alleging breach of the License Agreement, wrongful repudiation, servicemark infringement, unfair competition, dilution, and breach of the License Agreement by failure to de-identify.

On August 26, 1987, HJCI moved for a preliminary injunction prohibiting the Plaintiffs from infringing or diluting their servicemarks and corporate identity. A hearing was held on October 9, 1987 on the motion, which was denied by the Court without prejudice on November 3, 1987. The denial of the motion was based on the insistence by HJCI that the License Agreement was in full force and effect. The Court held that this contention prevented HJCI from seeking a preliminary injunction to prohibit the use of the licensed servicemarks.

HJCI then filed the Renewed Motion currently at issue, in which HJCI took the position that the License Agreement was no longer in force. Before the Court had ruled on the Renewed Motion, HJCI appealed the Court's Order denying the initial application for preliminary injunction. The Court, on January 14, 1988 (Doc. No. 50) directed further submissions on the question of its jurisdiction to entertain the Renewed Motion. However, before the Court had ruled, HJCI dismissed its appeal, eliminating any jurisdictional bar.

The Court in its Order of January 14, 1988 informed the parties that since a hearing had been held on the initial motion no hearing would be held on the Renewed Motion. That Order also took the Renewed Motion under advisement after the additional memoranda were submitted. Accordingly, the Renewed Motion is now ripe for determination.

## FINDINGS OF FACT

HJCI conducts business throughout the United States, maintaining directly or through related companies and licensees 460 motor lodges and 154 restaurants. Plaintiffs operated one of these motor

lodges until they repudiated the License Agreement. At those times, they used in connection with the business and with the express permission of HJCI a variety of HJCI servicemarks, both registered and unregistered.

HJCI is the effective owner, through a license from the actual owner, of a variety of federal servicemark registrations, including "HOWARD JOHNSON'S", "HJH", and the orange and blue stylized inn. These marks carry the registration numbers 714,495; 1,336,060; and 882,257 respectively. The "HOWARD JOHNSON'S" mark was first used with respect to motor lodges in 1954 but was used as early as 1929 for ice cream stands and restaurants. The "HJH" mark was first used in 1984 in connection with hotel services. Finally, the orange and blue stylized inn was first used in commerce in 1967 or 1966, depending on whether one examines the actual registration or the Affidavit of David A. Simon.[1] The parties agree that the "HOWARD JOHNSON'S" mark and the orange and blue stylized inn mark are incontestible.

HJCI also claims ownership of a variety of unregistered servicemarks. In particular, HJCI asserts rights in the orange roof and blue cupola design on actual buildings such as restaurants and motor lodges (as opposed to the stylized design), first used in 1966. Also, HJCI asserts rights in the mark "HJ", which was first used by entities related to HJCI before 1973. The first specific uses cited to the Court of the "HJ" mark by HJCI or related entities both occurred in 1973 by licensees in Lake Buena Vista, Florida, and Salt Lake City, Utah.[2]

In March of 1972, HJCI's predecessor-in-interest filed a federal servicemark registration for a design incorporating Howard Johnson's orange roof and blue cupola design and the HJ mark as used for restaurant services. Subsequently, the application was abandoned for business reasons. However, HJCI and its predecessor-in-interest did not intend to abandon their rights in the "HJ", to the extent they exist.

The License Agreement, which was entered into in 1965, specifically provided in paragraph 4 that:

It is agreed by the Licensee that rights in and to the name "Howard Johnson's Motor Lodge" *and any part thereof or addition thereto* and the use thereof shall be and remain the property of the Company, and the Licensee shall assign, transfer and convey to the Company by such instrument in writing as may be requested, all additional rights which may be acquired, if any, by reason of the use of said name by the Licensee.

(emphasis added). Then, in paragraph 15, the License Agreement states:

Upon the termination of this Agreement for any cause, the Licensee will immediately discontinue all use of trade names, trademarks, signs and forms of advertising and other indicia of operation as a "Howard Johnson's Motor Lodge", and will discontinue use of blue-green and orange colors, and remove the cupola and all orange tile roofs from the gate lodge and buildings or other structures on the described premises, as the Company may direct, effectively to distinguish the same from its former appearance as a designation of a "Howard Johnson's Motor Lodge",....

These parts of the License Agreement constitute an acknowledgement by the Plaintiffs of HJCI's rights in the unregistered mark of the blue cupola and orange roof building design. Furthermore, "HJ" and "H.J." are each "a part" of the "Howard Johnson's Motor Lodge" mark.

HJCI and its related entities go to considerable lengths to ensure the success of their business through the use of servicemarks. They expend large amounts for advertising using the registered and unregistered marks. In every year since and including 1986, these entities have expended more than $11,000,000 on advertising. As a consequence, they receive considerable gross revenues. For example, HJCI earned gross revenues exceeding $30,798,530 for its fiscal year ending June 30, 1986.

---

1. Mr. Simon's Affidavit is ambiguous in this regard.

2. Plaintiffs have used the unregistered "HJ" mark since 1971.

Additionally, HJCI attempts to protect its marks from dilution though lawsuits such as the instant suit and others. *See Howard Johnson Company, Inc. v. Amir Khimani*, 86–1079–Civ–T–17(c) (M.D.Fla. May 14, 1987).

The record demonstrates that Plaintiffs continued to use HJCI registered marks after they repudiated the License Agreement. The Affidavit of Joseph D. Milone makes clear that, at the time he visited Plaintiff's motor lodge: (1) Howard Johnson directories and brochures were visible behind the front counter of the motor lodge; (2) a map identifying the motor lodge as a Howard Johnson's appeared in the fitness center; (3) a Howard Johnson's coffee mug was on the counter in the fitness center;[3] and (4) the credit card receipt given to him identified the motor lodge as a Howard Johnson's. However, since receiving notice of the use of these marks, Plaintiffs have removed the offending items.

The record also demonstrates that the Plaintiffs have used HJCI's claimed unregistered marks. Plaintiffs' motor lodge has been held out to the public as the "HJ Inn",[4] and the associated plaza is known as "HJ Plaza".[5] HJCI and its predecessor-in-interest did not object to the Plaintiffs' use of the title "HJ Plaza" so long as the motor lodge was a licensed Howard Johnson's Motor Lodge, but HJCI does object to the use of the initials "HJ" to designate the inn or plaza after the termination of the License Agreement. The signs at the site advertising the "HJ Inn" and the "HJ Plaza" are orange and blue, and orange, respectively. Blue billboards advertise the

"HJ Inn". The motor lodge's lobby roof is orange.

Confusion of the public is made likely by the considerable number of licensed Howard Johnson establishments in the immediate area. These establishments use all of the above listed marks, including "HJ". The presence of a licensed "Howard Johnson's" restaurant adjacent to the Defendants' facilities particularly exacerbates the problem.[6] This restaurant, given its proper and prominent use of licensed marks, has a natural tendency to cause confusion in the minds of the public.

The public has actually been confused. Defendant Howard Johnson Franchise Systems ("HJFS") has received misdirected customer complaints from guests who believed that the Plaintiffs' Inn was a licensed Howard Johnson's facility. In two weeks in January in this year, HJFS received eight calls requesting information about the "Howard Johnson Motor Lodge on Lee Road", i.e., the Plaintiffs' inn.[7] At least one specific individual has been confused. *See* Affidavit of Dave Westerman.

## CONCLUSIONS OF LAW

The standard for preliminary injunctive relief is well-established; the plaintiffs (on the infringement claim) must show:

(a) substantial likelihood that plaintiffs will prevail on the merits; (2) substantial threat that plaintiffs will suffer irreparable injury if interlocutory injunctive relief is not granted; (3) threatened injury to plaintiffs outweighs threatened harm injunction may do to defendants; and (4)

---

3. Plaintiffs contend, quite reasonably, that this mug came from the adjacent licensed Howard Johnson's restaurant.

4. Plaintiffs represent in their Opposition to the Motion to Strike Affirmative Defenses that they are removing any use of the letters "HJ" for the motor lodge and will retain them only to designate the plaza.

5. The sign for the "HJ Plaza" has been in place since 1971.

6. This problem may eventually disappear given the alleged incipient conversion of the Howard Johnson's restaurant into a Frisch's Big Boy.

7. Of course, some of this confusion may have resulted from the listing of Plaintiffs' inn as a licensed inn in all but the most recent version of the Howard Johnson directory, the January to June, 1988 edition. However, the Court does not find that all of the actual confusion shown resulted from the listing by HJCI and its related entities of the Plaintiffs' motor lodge in the Howard Johnson's directory. Rather, while some of the actual confusion is chargeable to HJCI, most is chargeable to the Plaintiffs' use of HJCI's marks.

whether granting preliminary injunction will disserve the public interest. *E. Remy Martin & Co. v. Shaw–Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 n. 13 (11th Cir.1985). HJCI relies primarily on two of its claims to support the issuance of a preliminary injunction: (1) federal servicemark infringement prohibited by Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a); and (2) federal unfair competition prohibited by Section 43 of the Lanham Act, 15 U.S.C. § 1125(a). Because the Court finds that these two claims support the issuance of a preliminary injunction, the Court will not address whether any other individual claim, such as the state law dilution claim, would also support a preliminary injunction. *See Remy Martin,* 756 F.2d at 1534; *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1512 n. 3 (11th Cir. 1984).

### Likelihood of Success on the Merits

■ In order for HJCI to prevail on its servicemark infringement claim, it must show that the Plaintiffs: (1) without its consent, used in commerce a reproduction or colorable imitation of its servicemarks in connection with the sale or advertising of a service; and (2) such use is likely to cause confusion. 15 U.S.C. § 1114(1)(a). In order to prevail on its Section 43 claim, HJCI most show: "(1) that it has trademark rights in the mark or name at issue ...; and (2) that [Plaintiffs] adopted a mark or name that was the same, or confusingly similar to [HJCI's] mark, such that there was a likelihood of confusion for consumers as to the proper origin of the goods created by the [Plaintiffs'] use of the [mark]...." *Conagra,* 743 F.2d at 1512.

■ There is no dispute about the Plaintiffs' entitlement to hold themselves out as a Howard Johnson's Motor Lodge: the parties agree that the Plaintiffs' inn is no longer a Howard Johnson's lodge and should not be considered as such. Plaintiffs do not contend that the registered Howard Johnson's marks are invalid. Rather, the Plaintiffs contend that they

assiduously attempted to remove the vestiges of affiliation to Howard Johnson's and that any infringement of HJCI's marks was *de minimis* and has now been corrected. Plaintiffs also do not contend that they are entitled to maintain an orange lobby roof; instead they have informed the Court that the color of the roof would be changed to pink within fifteen days of November 23, 1987. As to these infringements, however, the mere discontinuance of infringing conduct does not render injunctive relief inappropriate. *Blisscraft of Hollywood v. United Plastics Co.,* 294 F.2d 694, 702 (2nd Cir.1961); *Upjohn Co. v. American Home Products Corp.,* 598 F.Supp. 550, 554–555 (S.D.N.Y.1984). There is a cognizable danger of future violations, given the past violations by Plaintiffs. *See* 2 McCarthy, *Trademarks and Unfair Competition* § 30.6, at p. 471 (2nd ed. 1984). Also, as hereinafter described, the Plaintiffs have attempted to trade on the good will of Howard Johnson's. Therefore, if the use of these marks is likely to cause confusion, such use can be enjoined despite Plaintiffs' discontinuance of infringement.

■ The primary dispute before the Court concerns the Plaintiffs' entitlement to use the letters "HJ". Plaintiffs have demonstrated that they began to use the letters "HJ" in 1971, and HJCI has not pointed out to the Court any specific prior use by HJCI, its predecessors-in-interest, or related entities. Nevertheless, the Court concludes that the right to use such mark is possessed by HJCI because the Plaintiffs' use of HJ infringes HJCI's registered "Howard Johnson's" mark. HJCI is the undisputed owner of the "Howard Johnson's" mark for motor lodges.[8] The use of "HJ" in the name of a motor lodge, and in the name of a plaza associated with a motor lodge, is the use of a colorable imitation of "Howard Johnson's" and is likely to cause confusion, rendering use of those initials for those purposes a violation of 15 U.S.C. § 1114(1)(a).

The Court finds that there is, on the facts of this case, a strong likelihood of

---

**8.** Clearly, the mark "Howard Johnson's" was used and registered by HJCI and its related entities prior to any use by Plaintiffs of the "HJ" mark.

confusion between "Howard Johnson's" and "HJ".[9] The Eleventh Circuit has articulated certain factors, which may be considered along with other factors, in determining the likelihood of confusion. *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1488 (11th Cir. 1987); *Swatch Watch, S.A. v. Taxor, Inc.*, 785 F.2d 956, 958 (11th Cir.1986); *Remy Martin*, 756 F.2d at 1530–1533. The Court determines the applicable factors as follows:

(1) *Type of Mark:* Due to extensive advertising and long use, "Howard Johnson's" must be considered a strong mark. *Remy Martin*, 756 F.2d at 1533. Furthermore, it is incontestible.

(2) *Similarity of Design of Marks:* In making this determination, a court must examine the overall impression created by the marks, including appearance, sound, meaning and manner of display. *Remy Martin*, 756 F.2d at 1531. Here, "HJ" is an obvious abbreviation of Howard Johnson's, and its meaning is Howard Johnson's. HJCI often uses this abbreviation to designate its hotels. The Plaintiffs use the same colors used by HJCI in many places. Therefore, the marks are quite similar.

(3) *Similarity of Product:* The services offered by HJCI and Plaintiffs are identical and are clearly the sort that the public attributes to a single source.

(4) *Identity of Retail Outlets and Purchasers:* While motor lodge services are always sold at separate locations, the services of Plaintiffs are sold from a building that appears to be a Howard Johnson's. Furthermore, the targeted purchasers are the same.

(5) *Similarity of Advertising Media Used:* The same media is used.

(6) *The Alleged Infringer's Intent:* The use of the letters "HJ" can only be described as an obvious attempt to trade on the "Howard Johnson's" mark. There is simply no other reason to choose the letters "HJ". When initiated in 1971, of course, this was not a "bad" intent, since the Plaintiffs were licensed to use the HJCI marks. However, after termination of the License Agreement, the refusal to choose a different name for the plaza and inn shows an intent to continue trading on the "Howard Johnson's" mark.[10]

(7) *Actual Confusion:* Some, although not overwhelming, confusion has been shown. *See Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1544 (11th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987).

In total, the foregoing factors indicate a strong likelihood of confusion between "HJ" and "Howard Johnson's". Of particular importance in this case is the fact that the Plaintiffs' motor lodge was once a Howard Johnson's. *See Burger King Corp. v. Mason*, 710 F.2d 1480, 1492–1493 (11th Cir.), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984). Therefore, HJCI has proven a substantial likelihood of success on the merits.

The case for a preliminary injunction is less strong if the Defendants have carried through with their intent to remove the designation "HJ" from the motor lodge and to use the "HJ" only in association with the plaza.[11] However, such use is still confusing. The plaza is adjacent to an inn which appears much like a Howard Johnson's. The public could easily confuse the two. Such a plaza is a business that a company like HJCI could be expected to

---

9. A similar result was reached as early as 1967. *See Howard Johnson Co. v. Ho–Jo Campsites, Inc.*, 273 F.Supp. 447, 448 (M.D.Fla.1967) (use of "Ho–Jo" for *campsites* is unfair competition).

10. The Court does not find or imply that the Plaintiffs are guilty of bad faith. Rather, the Court finds, on this record, that the Plaintiff

mistakenly believed that they had superior rights in the "HJ" mark.

11. Specifically, two factors would weigh less toward a finding of likelihood of confusion: the products would be less similar and purchasers would be less similar.

enter, as evidenced by the fact that the Plaintiffs did enter the business. Accordingly, after reweighing the factors, the Court finds that the Plaintiffs' use of the "HJ" mark in the name of their plaza is likely to cause confusion.

Of course, Plaintiffs' improper use of the actual "Howard Johnson's" mark, such as in fliers and on the map, causes a likelihood of confusion. The analysis is the same as above, except that the marks are identical and not merely similar. The use of an orange roof also entails a likelihood of confusion, given the similarities of Plaintiffs' business to that of HJCI's.

Plaintiffs cannot claim that HJCI and its related entities acquiesced in Plaintiffs' use of "HJ", since any implied permission to use such mark was based upon the ongoing license. In other words, HJCI did not object to the use of a mark confusingly similar to "Howard Johnson's" so long as the motor lodge *was* a Howard Johnson's. Plaintiffs have not shown that HJCI ever encouraged Plaintiffs to develop their own interest in the "HJ" mark *to the exclusion* of the rights of HJCI and related entities. When the License Agreement was terminated, HJCI timely requested that the Plaintiffs cease using marks confusingly similar to HJCI's marks and did not encourage further use of the marks. Therefore, acquiescence has not been shown. *See* 2 McCarthy, *Trademarks and Unfair Competition* § 31.14, at p. 585 (2nd ed. 1984).

Also because of the timely objection, HJCI's claim is not barred by laches. *See Ambrit*, 812 F.2d at 1545–1547; *NAACP v. NAACP Legal Defense & Educational Fund, Inc.*, 753 F.2d 131, 140 (D.C.Cir.) (a parent organization should assert its exclusive right to a mark when the affiliation ends), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985).

The Court notes that in no sense has HJCI ever abandoned its claim to the mark "Howard Johnson's". That mark has been in continuous use throughout the United States since its registration. Even if HJCI had abandoned its claim for explicit rights in "HJ", HJCI could still prevent the confusing use of the mark "HJ" through its rights in "Howard Johnson's".

In addition, the use of "HJ" by Plaintiffs infringes upon HJCI's registered mark "HJH" for hotel services. For the reasons expressed above with respect to the mark "Howard Johnson's", "HJ" is confusingly similar to "HJH". Furthermore, Plaintiffs' rights in "HJ" are not superior to HJCI's rights in "HJH" because any use of "HJ" prior to the summer of 1985 inured to the benefit of HJCI, by which time HJCI had already registered the "HJH" mark.[12] The law is clear that while a license is in effect, use of a licensed mark by a licensee inures to the benefit of the licensor. *See* 15 U.S.C. § 1055; 3 R. Callman, *Unfair Competition, Trademarks and Monopolies* § 19.48, at p. 207 (4th ed. 1983). The Court further concludes that during a licensing relationship, use of a mark *confusingly similar to a licensed mark* inures to the benefit of the licensor.[13] If a licensee wishes to create rights in a mark separate from those marks licensed to it, the licensee has an affirmative obligation to choose a mark sufficiently different from the licensed marks so that the public will not be confused into thinking the new mark belongs to the licensor. The licensee trades upon

---

**12.** In this case, the "HJH" mark was registered on May 14, 1985. At best, the Plaintiffs did not repudiate the License Agreement until the summer of 1985. *See* Joint Affidavit of Charles W. Clayton, Jr., and W. Malcolm Clayton, ¶ 11.

The federal registration issued for the mark "HJH" creates a prima facie presumption that "HJH" had, at that time, acquired secondary meaning. 1 J. McCarthy, *Trademarks and Unfair Competition* § 11:16, at 472 (2nd ed. 1984). Plaintiffs did not rebut this presumption. Therefore, HJCI developed secondary meaning

in its "HJH" mark before Plaintiffs developed secondary meaning in their "HJ" mark, giving HJCI priority. *See* 1 J. McCarthy, *Trademarks* § 16:12, at 746.

**13.** There is also a contractual basis for this holding. Paragraph 4 of the License Agreement, quoted above, provides in effect that any additional rights gained by the licensee in any part of the name "Howard Johnson's Motor Lodge" shall be transferred to the licensor upon its request.

the good will of the licensor at the licensee's peril.

Having made the foregoing determinations, the Court need not address the application of the doctrine of licensee estoppel to these facts.

█ HJCI also argues that it possesses rights in the initials "HJ", and that use of that mark by Plaintiffs for their inn and plaza therefore violates 15 U.S.C. § 1125(a). The Court finds that HJCI and its predecessors-in-interest acquired superior rights in the abbreviated form of "Howard Johnson's", "HJ", through use of full-length form. *See* 3A R. Callman, *Unfair Competition, Trademarks and Monopolies* § 20.21, at p. 136 (4th ed. 1987). "This reasoning makes good sense in situations where the public considers the abbreviated form to be the spoken or written equivalent of the full-length form even before the organization in question actually uses the abbreviation to refer to itself." *Id.* HJCI also established rights in the "HJ" mark through the use of that mark by licensees.

█ HJCI has established secondary meaning for the unregistered "HJ" mark.[14] HJCI has shown: (1) long and extensive use; (2) extensive advertising; (3) efforts to promote a connection between "HJ" and Howard Johnson's, at least since 1973; and (4) that some members of the public actually associate "HJ" with "Howard Johnson's". *See American Television and Communications Corp. v. American Communications and Television, Inc.*, 810 F.2d 1546, 1549 (11th Cir.1987); *Conagra*, 743 F.2d at 1513. Furthermore, as described above, Plaintiffs cannot claim any right in "HJ" before the summer of 1985. Therefore, a preliminary injunction should also issue under 15 U.S.C. § 1125(a), based on HJCI's independent rights in the unregistered "HJ" mark.[15]

As described above, the defenses of laches and acquiescence have not been shown to apply. Nor have the Plaintiffs made out a case of abandonment on this record. The decision by HJCI's predecessor in interest to abandon its attempt to register the "HJ" mark is not probative that the mark itself was abandoned. *See* 37 CFR § 2.68 (1987). Furthermore, the "HJ" mark has been regularly used by HJCI and its predecessors-in-interest since 1973. *See* 15 U.S.C. § 1127; *Remy Martin*, 756 F.2d at 1532.

Therefore, HJCI has demonstrated a substantial likelihood of success on the merits.

### Irreparable Harm

█ Given the substantial likelihood of confusion, HJCI has met its burden of proving a substantial threat of irreparable harm. HJCI has spent considerable revenue advertising its marks and building good will which will be in serious jeopardy if it is unable to control the use of its marks. HJCI may lose trade if customers believe the motor lodge is sponsored by Howard Johnson's. In this case, HJCI has made a sufficiently strong showing of a likelihood of confusion that it has also demonstrated irreparable harm. *Remy Martin*, 756 F.2d at 1530. Indeed, the Second Circuit has held that in cases involving licensing, a licensor who demonstrates a likelihood of confusion as to product source automatically demonstrates irreparable harm. *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 42–43 (2nd Cir.1986).

### Balance of Harms

The balance of harms favors HJCI. It will suffer irreparable damage if Plaintiffs are allowed to continue infringing its marks. In contrast, Plaintiffs would suffer no legitimate harm since the prelimi-

---

**14.** As an abbreviation of a name, secondary meaning may well be required for protection of the mark "HJ". *See* 1 J. McCarthy, *Trademarks and Unfair Competition* §§ 11:13 & 13:2 (2nd ed. 1984). However, no secondary meaning need be shown for the "Howard Johnson's" mark since it is incontestible. 1 J. McCarthy, *Trademarks* § 13:11, at 617.

**15.** Almost by definition, the mark "HJ" is confusingly similar to "HJ". Through reexamination of the seven factors weighed above, the Court finds that the balance of factors supports a finding of a likelihood of confusion for the reasons expressed previously.

nary injunction would only prevent them from using marks which they are not entitled to use. Furthermore, the Plaintiffs have already expressed their intent to remove all offending marks except that they still wish to call their plaza "HJ Plaza". Thus, the harm to the Plaintiffs from the issuance of a preliminary injunction is less than the harm to HJCI if the preliminary injunction does not issue.

### The Public Interest

The granting of a preliminary injunction will not disserve the public interest. Instead, granting the injunction will serve the public interest by preventing consumer confusion. *See Church of Scientology,* 794 F.2d at 44.

### Conclusion

Accordingly, the Renewed Motion for Preliminary Injunction is GRANTED, and the Court DECREES that:

Plaintiffs, together with their agents, employees, representatives, and all persons acting by, through or for them or on their behalf, are hereby preliminarily enjoined from:

1. Using the word "HOWARD JOHNSON'S" or any colorable imitation thereof;

2. Using the letters "HJ" or "HJH", or any colorable imitation thereof including but not limited to "HJ Inn", "HJ Plaza Inn", and "HJ Plaza";

3. Using the orange roof and blue cupola design servicemark, or an imitation thereof;

4. Using any of the foregoing marks or colorable imitations thereof in any form of advertising or promotion of Plaintiffs' Orange County, Florida operations;

5. Using any of the foregoing marks or colorable imitations thereof in connection with the sale of motor lodge services;

6. Engaging in any advertising or sales practices that disparage the foregoing marks or the Howard Johnson's corporate identity.

Plaintiffs are further directed to file and serve within thirty days after entry of this injunction a report in writing under oath setting forth in detail the manner and form in which the Plaintiffs have complied with this injunction.

This preliminary injunction is conditioned on the filing by HJCI within twenty (20) days from the date of this order of an undertaking in the sum of $30,000 to make good such damages as may be suffered or sustained by Plaintiffs if they are found to have been wrongfully enjoined.

DONE AND ORDERED.