**BURGER KING CORPORATION,**
**Plaintiff,**

v.

**Nasif R. MAJEED, A & M Fast Foods, Inc., Reginald Underwood, Anna J. Hollis, Leroy Kelly, Dorothy Allen, Leedot Enterprises, Inc., Rubin Dale McCollum, Adrienne M. McCollum, John Davis, Judith G. Davis and Ferryboat Associates, Defendants.**

**Carole HALL, et al., Plaintiffs,**

v.

**BURGER KING CORPORATION,**
**Defendant.**

Nos. 92–1572–CIV, 89–0260–CIV.

United States District Court,
S.D. Florida.

Aug. 21, 1992.

Stephen R. Lang, Howard Wolfson, Breed Abbott & Morgan, New York City, T. Joan Lawrence, Averill & Lawrence, Miami, Fla., for plaintiff.

Russell Frisby, Jr., John H. Morris, Jr., Venable, Baetjer & Howard, Baltimore, Md., Robert Jarco, Miami, Fla., for defendants.

**ORDER GRANTING BURGER KING CORPORATION'S MOTION FOR A PRELIMINARY INJUNCTION AND DENYING DEFENDANTS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

KEHOE, District Judge.

This matter came before the Court on July 17, 1992, on Plaintiff Burger King Corporation's (hereinafter "BKC") Motion in *Burger King Corp. v. Majeed, et al.,* Case No. 92–1572–Civ–Kehoe, for a Preliminary Injunction to enjoin Defendants Nasif R. Majeed, A & M Fast Foods, Inc., Reginald Underwood, Anna J. Hollis, Leroy Kelly, Dorothy Allen, Leedot Enterprises, Inc., Rubin Dale McCollum, Adrienne M. McCollum, John Davis, Judith G. Davis and Ferryboat Associates (hereinafter collectively the "defendants")[1] from their unauthorized operation of Burger King® restaurants and use of BKC's registered trademarks and service marks (the "BKC Marks"). This matter is also before the Court on defendants' Motion for issuance of a Temporary Restraining Order and Preliminary Injunction in a companion action, *Carole Hall, et al. v. Burger King Corporation,* Case No. 89–0260–Civ–Kehoe, which is presently pending before this Court. Defendants, who are plaintiffs and counterclaim-defendants in the companion *Hall* action, seek to restrain and enjoin BKC from ejecting them from their Burger King® restaurants during the pendency of that action.

Having considered the memoranda and affidavits filed in support of and in opposition to the parties' respective motions, the evidence submitted at the preliminary injunction hearing on July 17, 1992,[2] and the arguments of counsel for the parties, this Court finds as follows:

1. On July 15, 1992, BKC withdrew its request that a preliminary injunction be entered against defendant Anna Hollis, without prejudice to renewal of its motion at a later date.

2. At the July 17, 1992 hearing, counsel chose to rely on the memoranda and affidavits previously submitted in support of and in opposition to the pending motions and declined to present live testimony, including testimony from any of the defendants. Defendants' counsel did, however, make a proffer of evidence which the Court heard and considered in deciding the instant motions.

## FINDINGS OF FACT

1. BKC is incorporated under the laws of the State of Florida and maintains its principal place of business in Miami, Florida. BKC is engaged in the business of operating a national and worldwide system of company-owned and franchised Burger King® restaurants.

2. Defendants are former franchisees of BKC. Their franchises were terminated for nonpayment of contractual royalties and advertising and sales promotion contributions.

### A. *The BKC Marks*

3. BKC employs, advertises and publicizes throughout the United States certain trademarks and service marks, collectively referred to as the "BKC Marks".

4. The following BKC Marks are registered in the United States Patent and Trademark Office:

| Reg. No. | Description | Year Registered |
| --- | --- | --- |
| 782,990 | HOME OF THE WHOPPER | 1965 |
| 869,775 | BURGER KING | 1969 |
| 899,775 | WHOPPER | 1970 |
| 901,311 | BURGER KING with logo | 1970 |
| 961,014 | BURGER KING with logo | 1973 |
| 1,057,250 | BURGER KING (Design) (lined for the colors orange and red) | 1977 |
| 1,070,331 | WHALER | 1977 |
| 1,076,177 | BURGER KING (Stylized) | 1977 |
| 1,146,721 | BURGER KING (with logo) | 1981 |
| 1,451,533 | A.M. EXPRESS | 1987 |
| 1,550,398 | CROISSAN'WICH | 1989 |

(*See* the Affidavit of Emily Patricios, sworn to July 6, 1992, ¶ 4, "Patricios Aff.")

5. The registrations of the BKC Marks are currently in full force and effect.

6. Nine of the eleven BKC Marks were registered over five years ago and are therefore now incontestable pursuant to 15 U.S.C. § 1065.

7. All right, title and interest to the BKC Marks and the design, decor and image of Burger King® restaurants is vested solely in BKC and its wholly-owned subsidiary, Burger King Brands, Inc. (*See* Patricios Aff. ¶ 2.)

8. BKC and its franchisees have for many years spent vast sums of money advertising and promoting Burger King® restaurants, and the products and services sold under the various BKC marks. In the year 1990 alone, BKC spent approximately $230 million. (*See* the Affidavit of Mark Giresi, sworn to July 6, 1992, ¶ 3, "Giresi Aff.")

9. As a result of this extensive advertising and promotion, valuable goodwill has been developed for the BKC Marks and for the restaurants, products and services which bear the BKC Marks and thus identify BKC as their sponsor and source. (*See* Patricios Aff. ¶ 3.)

10. BKC franchisees are granted a limited license to use and display the BKC Marks during the term of their franchise agreements. Franchisees are not, however, authorized to use the BKC Marks following the expiration or termination of their franchises. Thus, for example, defendants' franchise agreements expressly provide that upon termination, defendants' right to use or display the BKC Marks "shall terminate" and defendants "shall not thereafter identify [themselves] as a Burger King franchisee ... or use any of BKC's trade secrets, operating procedures, promotional materials, Marks or any mark confusingly similar." (*See* Giresi Aff. ¶ 23.)

B. *Defendants' Franchise and Lease Agreements with BKC*

11. BKC and the defendants are parties to various agreements, the terms and provisions of which are summarized below.

12. On April 17, 1981, BKC entered into a Franchise Agreement with defendant Nasif R. Majeed, pursuant to which BKC franchised Majeed to operate Burger King® Restaurant No. 3154 in Charlotte, North Carolina, and granted Majeed a limited license to use the BKC Marks and the Burger King® system of restaurant operation in connection with the restaurant. With BKC's consent, Majeed thereafter assigned the Franchise Agreement to defendant A & M Fast Foods, Inc. ("A & M"). (*See* Giresi Aff. ¶ 7.)

13. On February 14, 1986, BKC entered into a Franchise Agreement with defendant Reginald Underwood, pursuant to which BKC franchised Underwood to operate Burger King® Restaurant No. 3550 in Fredericksburg, Virginia, and granted Underwood a limited license to use the BKC Marks and the Burger King® system of restaurant operation in connection with the restaurant. (*See* Giresi Aff. ¶ 8.)

14. On May 6, 1981 and January 12, 1986, BKC entered into Franchise Agreements with defendants Dorothy Allen and Leroy Kelly, pursuant to which BKC franchised Allen and Kelly to operate, respectively, Burger King® Restaurant Nos. 3138 and 2117 in Philadelphia, Pennsylvania, and granted them limited licenses to use the BKC Marks and the Burger King® system of restaurant operation in connection with the restaurants. With BKC's consent, Allen and Kelly thereafter assigned the Franchise Agreements to defendant Leedot Enterprises, Inc. ("Leedot"). (*See* Giresi Aff. ¶ 10.)

15. On June 11, 1985, BKC entered into a Franchise Agreement with defendants Rubin and Adrienne McCollum to operate Burger King® Restaurant No. 4482 in Brooklyn Park, Maryland. On or about November 20, 1986, BKC also entered into a Franchise Agreement with defendant Ferryboat Associates ("Ferryboat"), whose partners are Rubin and Adrienne McCollum, to operate Burger King® Restaurant No. 201 in Fairfax, Virginia. Pursuant to these Franchise Agreements, BKC granted the McCollums and Ferryboat limited licenses to use the BKC Marks and the Burger King® system of restaurant operation in connection with the restaurants. With BKC's consent, the McCollums and Ferryboat assigned a twenty-five percent ownership interest in each restaurant to defendants John and Judith Davis. (*See* Giresi Aff. ¶ 11.)

16. In addition to the Franchise Agreements described above, defendants are also the original parties to, or the assignees of, Lease Agreements with BKC (or with BKC's assignor) for their Burger King® restaurants. (*See* Giresi Aff. ¶ 12.)

C. *Defendants' Failure to Pay Their Contractual Obligations to BKC*

17. Under the terms of defendants' Franchise Agreements with BKC, in consideration for the license to operate Burger King® restaurants and use the BKC Marks, defendants agreed to pay monthly royalties and advertising and sales promotion contributions to BKC based upon their restaurant's monthly gross sales. Most importantly, the Franchise Agreements each specifically provide that the failure to pay any royalty or advertising and sales promotion contribution constitutes an act of default under the agreements. (*See* Giresi Aff. ¶ 13; Franchise Agreement Restaurant Nos. 3154, 3550, 3138, 2117, 4482 and 201, Section 16.A.(2); Franchise Agreement Restaurant No. 1648, Section XII.)

18. Similarly, in their Lease Agreements, defendants agreed to pay rent to BKC along with all taxes, assessments and other charges which come due and payable in connection with their occupancy or possession of the restaurants' premises. The Lease Agreements provide that the failure to pay rent or real estate taxes to BKC constitutes an act of default under the agreements. (*See* Giresi Aff. ¶ 14.)

19. Shortly before the defendants' filing of their alleged damage action against BKC, *Carole Hall, et al. v. Burger King Corporation,* Case No. 89–0260–Civ–Ke-

hoe,[3] defendants stopped paying their monthly financial obligations to BKC under their Franchise and Lease Agreements. (*See* Exhibit "A" to the Affidavit of Cynthia Hartmann, sworn to July 6, 1992, "Hartmann Aff.") Apparently believing that, once having filed a putative class action against BKC, they could simply ignore their contractual obligations, defendants refused to pay their royalties, advertising contributions and rent to BKC. Defendants' refusal to pay their contractual obligations constituted a clear and unequivocal act of default under the terms of each of their respective Franchise and Lease Agreements.

20. Accordingly, by letters dated December 23, 1988 and January 3, 1989, BKC sent Notices of Default under the Franchise and Lease Agreements to defendants Majeed, A & M, Underwood, the McCollums, the Davises and Ferryboat. By letter dated June 13, 1989, BKC sent Notice of Default under the Franchise and Lease Agreements for Restaurant Nos. 2117 and 3138 to defendants Allen, Kelly and Leedot. (*See* Giresi Aff. ¶ 15.)

21. Defendants refused to cure their payment defaults by making their contractually required payments to BKC. (*See* Giresi Aff. ¶ 16.)

22. Following defendants' refusal to cure their payment defaults, by letters dated February 27 and June 29, 1989, BKC notified defendants that their Franchise and Lease Agreements were terminated. (*See* Giresi Aff. ¶ 16.) BKC's Notices of Termination demanded that defendants immediately comply with the post-termination covenants of their Franchise and Lease Agreements, requiring defendants to immediately cease and desist from all use of the BKC Marks and to vacate the restaurants' premises. (*See* Giresi Aff. ¶¶ 17, 22–24.)

D. *Defendants' Infringement of the BKC Marks*

23. Notwithstanding BKC's clear legal entitlement to eject these terminated franchisees from their restaurants, instead, BKC agreed to give them one more chance. Thus, on March 28, 1989, BKC entered into a stipulation with defendants Majeed, Underwood, Hollis, Rubin and Adrienne McCollum and John and Judith Davis pursuant to which BKC agreed not to eject them from their Burger King® restaurants, or to enforce the post-termination covenants of their Franchise and Lease Agreements, so long as they paid their ongoing monetary obligations to BKC arising from March 1, 1989 forward. (*See* Giresi Aff. ¶ 18.)

24. The stipulation was approved by this Court and the parties directed to comply with its terms by Order dated April 19, 1989.

25. On September 11, 1989, BKC entered into a substantially identical stipulation with defendants Allen, Kelly and Leedot, similarly requiring them to pay their ongoing monetary obligations to BKC. (*See* Giresi Aff. ¶ 18.)

26. In these stipulations, defendants each acknowledged that they duly received BKC's Notices of Default and Termination, that they failed to pay monetary obligations due and owing to BKC and that BKC had therefore terminated their respective Franchise and Lease Agreements. The stipulations also expressly set forth BKC's rights to enforce the Notices of Termination if defendants failed to pay their ongoing monetary obligations as required under the stipulations:

> Should the franchisees fail to comply ... then BKC may, at its option ... seek to enforce in any court of competent jurisdiction, the covenants of the Agreements as well as all applicable Federal and State laws.

(*See* Giresi Aff. ¶ 19.)

27. In fact, notwithstanding the stipulations and this Court's April 19, 1989 Order,

---

**3.** This alleged class action was commenced in October of 1988 by a group of twenty-four past and present minority franchisees of BKC. They allege damage claims against BKC purportedly for violation of the civil rights and antitrust laws, as well as for fraud and interference with prospective contractual relations. At the July 17, 1992 hearing, the Court denied defendants' motion to certify a class. A formal order will follow.

defendants failed to pay their ongoing monetary obligations from March 1, 1989 forward. As of June 15, 1992, collectively the defendants had failed to pay approximately $1,000,000 to BKC since March 1, 1989.

(*See* Exhibit A to the Hartmann Affidavit). This amount is in addition to defendants' substantial pre-stipulation indebtness to BKC. The individual post-stipulation breakdown is as follows:

| Defendant(s) | Post–Stipulation Debt to BKC |
|---|---|
| Allen/Kelly/Leedot | $408,775.69 |
| Underwood | $315,928.93 |
| Majeed/A & M | $135,871.11 |
| McCollum/McCollum/ Davis/Davis/Ferryboat[4] | $135,001.31 |

28. By letters dated June 26, 1992, BKC's counsel notified defendants and their counsel that due to defendants' breach of the stipulations, defendants were to comply immediately with BKC's Notices of Termination by, among other things, ceasing the operation of their Burger King® restaurants and all use of the BKC Marks and vacating the restaurants' premises. (*See* Giresi Aff. ¶ 21.)

29. Notwithstanding BKC's counsel's letters and the termination of their franchisees and leases, defendants have refused to vacate the premises of their restaurants and continue to hold themselves out to the public as operating authorized Burger King® restaurants and to use the BKC Marks at their restaurants. Defendants' continued operation of their restaurants and use and display of the BKC Marks is without the license or consent of BKC. Moreover, defendants' actions have caused or are likely to cause mistake, confusion or deception in the mind of the public as to the source, affiliation and sponsorship of their restaurants.

30. By virtue of BKC's termination of defendants' franchises, BKC is unable to control the nature and quality of the goods and services that defendants now provide at their restaurants.

31. More importantly, consumers who presently patronize defendants' restaurants have no way of knowing that defendants' franchises were terminated and that their restaurants are no longer affiliated with BKC. Accordingly, any shortcomings of defendants' restaurants will be attributed to BKC and to the entire Burger King® system.

32. To enjoin defendants' unauthorized operation of Burger King® restaurants and infringement of the BKC Marks, BKC commenced suit on July 6, 1992 and simultaneously moved for entry of a preliminary injunction. On or about the same date, defendants moved for entry of a temporary restraining order in the alleged class action. With the consent of the parties, both motions were heard on July 17, 1992, at which time the Court also granted defendants' application to treat their motion as one seeking entry of a preliminary injunction.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction pursuant to Section 39 of the Lanham Trademark Act of 1946, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1332(a)(1), 1337, and 1338(a) and (b).

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b) and this

---

**4.** While the McCollums contest the amount due and owing to BKC since March 1, 1989, there is no question that all of their monetary obligations have not been paid. Mr. McCollum was present in court on July 17, 1992 and did not offer any testimony to the contrary. It is also noteworthy that the McCollums do not deny that they failed to pay over $300,000 to BKC prior to March 1, 1989, leading to the termination of their Franchise and Lease Agreements. These amounts are still due and owing to BKC.

Court's inherent power to enforce its own Orders.

3. BKC's claims arise out of defendants' alleged violations of Sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), the Florida common law of trademark infringement, service mark infringement and unfair competition, and defendants' breaches of the terms of their respective Franchise and Lease Agreements.

4. The standard for preliminary injunctive relief is well-settled. A plaintiff must show:

> (1) substantial likelihood that [it] will prevail on the merits; (2) substantial threat that [it] will suffer irreparable injury if interlocutory injunctive relief is not granted; (3) [that the] threatened injury to [it] outweighs any threatened harm injunction may do to defendants; and (4) [that] granting preliminary injunction will [not] disserve the public interest.

*E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1530 n. 13 (11th Cir.1985) (citation omitted); *Sundor Brands, Inc. v. Borden, Inc.,* 653 F.Supp. 86, 90 (M.D.Fla.1986).

5. BKC relies primarily on two of its claims to support the issuance of a preliminary injunction: (1) federal trademark infringement prohibited by Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); and (2) federal unfair competition prohibited by Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). This Court finds that these two claims support the issuance of a preliminary injunction and accordingly need not address BKC's remaining claims. *See E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc., supra,* 756 F.2d at 1534.

A. *BKC Is Likely To Prevail On Its Claims Under The Trademark Laws*

■ 6. Under either Section 32(1), which proscribes trademark infringement, or Section 43(a), which prohibits, *inter alia,* false designations as to the source or origin of business establishments, services and goods, the Lanham Act "creates a claim for trademark infringement when a trademark holder can demonstrate that the use of its trademark by another is likely to confuse consumers as to the source of the product." *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.,* 832 F.2d 1311, 1314 (2d Cir.1987). "[T]he critical question ... is whether there is a likelihood of confusion, mistake, or deception between the registered mark and the allegedly infringing mark." *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 972 (11th Cir.1983); *Sun–Fun Products v. Suntan Research & Development,* 656 F.2d 186, 189 (5th Cir.1981).

7. "[I]t is well-established that 'falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source or *sponsorship*—such as by using BKC's Marks without permission—constitutes infringement.'" *Burger King Corp. v. Hall,* 770 F.Supp. 633, 637 (S.D.Fla.1991) (quoting *Burger King Corp. v. Mason,* 710 F.2d 1480, 1492 (11th Cir. 1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984) (emphasis in original)).

8. The case at bar is on all fours with *Burger King Corp. v. Hall, supra,* 770 F.Supp. 633, in which the lead plaintiff in the putative class action, Carole Hall, continued to use the BKC Marks following termination of her franchise without BKC's consent. BKC brought suit and moved for entry of a preliminary injunction to enjoin Hall's unauthorized use of the BKC Marks. Hall argued that her franchise was wrongfully terminated since, among other things, her damage claims in the putative class action exceeded the total of her unpaid monetary obligations to BKC and BKC's termination of her franchise was part of the alleged discrimination against her. In granting BKC's motion for a preliminary injunction, this Court held that:

> Having chosen to stop her own performance under the parties' Franchise Agreement by refusing to pay her monthly royalties and advertising and sales promotion contributions to BKC, Hall herself effectively terminated her Franchise Agreement with BKC. Hav-

ing done so, Hall may pursue her damage claims against BKC, including her wrongful termination claim, but she may not continue to use the BKC Marks in the operation of her restaurant. In order to have preserved her right to continue to use the BKC Marks, Hall should have continued to pay her contractual royalties and advertising and sales promotion contributions to BKC. 770 F.Supp. at 638–39. Here, there are even stronger grounds for entry of an injunction in favor of BKC; defendants entered into stipulations in which they specifically agreed to pay their ongoing monetary obligations to BKC during the pendency of the putative class action or else be ejected from their restaurants.

■ 9. Both *Burger King Corp. v. Hall* and *Burger King Corp. v. Mason* reflect well-settled doctrine that a terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes trademark infringement. *See Ramada Inns, Inc. v. Gadsden Motel Co.,* 804 F.2d 1562, 1566 (11th Cir.1986); *Professional Golfers Ass'n of America v. Bankers Life & Casualty Co.,* 514 F.2d 665, 670 (5th Cir.1975); *In re Gainesville P–H Properties, Inc.,* 77 B.R. 285, 294 (Bankr. M.D.Fla.1987).

■ 10. In determining whether defendants' use of the BKC Marks is likely to cause confusion—the relevant inquiry under the trademark laws—the following factors must be considered: (1) the type of plaintiff's trademark; (2) the similarity of design between plaintiff's marks and those used by defendant; (3) the similarity of the products; (4) the identity of retail outlets and purchasers; (5) the similarity of advertising media used; (6) defendant's alleged intent; and (7) proof of actual confusion. *See Dieter v. B & H Industries,* 880 F.2d 322, 326 (11th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990); *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1538 (11th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987); *Jaguar Cars Ltd. v. Skandrani,* 771 F.Supp. 1178, 1183 (S.D.Fla.1991).

11. Under each of these factors, BKC has established that defendants' continued use of the BKC Marks will result in the proscribed consumer confusion.

12. First, as this Court held in *Burger King Corp. v. Hall,* BKC's Marks are registered, incontestable and subject to a statutory presumption of validity under Sections 7 and 15 of the Lanham Act, 15 U.S.C. §§ 1057(b) and 1065. "The BKC Marks are also highly fanciful, arbitrary in their selection and enjoy a distinctiveness and recognition which sets them apart as having BKC as their source." *Burger King Corp. v. Hall, supra,* 770 F.Supp. at 637. Such marks "are widely protected...." *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 259 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980) (citation omitted); *Jaguar Cars Ltd. v. Skandrani, supra,* 771 F.Supp. at 1183.

13. Second, the Marks in question are identical since defendants continue to use the BKC Marks. *Burger King Corp. v. Hall, supra,* 770 F.Supp. at 638. The defendants' concurrent use of the BKC Marks is likely to cause consumer confusion about their affiliation with BKC and the Burger King® system.

14. Third, " '[t]he greater the similarity between the products and services, the greater the likelihood of confusion.' " *John H. Harland Co. v. Clarke Checks, Inc., supra,* 711 F.2d at 976 (quoting *Exxon Corp. v. Texas Motor Exchange,* 628 F.2d 500, 505 (5th Cir.1980)); *Burger King Corp. v. Hall, supra,* 770 F.Supp. at 638. Here, the Marks identify identical products and services, since defendants continue to operate their restaurants as if they were *bona fide* Burger King® franchisees.

15. Fourth, BKC and defendants sell their products and services through identical retail outlets—fast-food restaurants—to the same customers. *Burger King Corp. v. Hall, supra,* 770 F.Supp. at 638; *see also John H. Harland Co. v. Clarke Checks, Inc., supra,* 711 F.2d at 976.

16. Fifth, the advertising of the parties' products and services is identical. Defen-

dants continue to realize the benefit of general Burger King® advertising—even though they refuse to pay for it. *Burger King Corp. v. Hall, supra,* 770 F.Supp. at 638.

■ 17. Sixth, while proof of intentional infringement is not required to establish liability under the Lanham Act, such proof " 'is sufficient of itself for this Court to base a finding of 'likelihood of confusion.' ' " *Burger King Corp. v. Hall, supra,* 770 F.Supp. at 638 (quoting *Varitronics Sys., Inc. v. Merlin Equip., Inc., supra,* 682 F.Supp. 1203, 1207 (S.D.Fla.1988) (citation omitted)). Here, defendants clearly intend to pass off their restaurants as authorized Burger King® restaurants by continuing to exploit the BKC Marks, despite knowledge that their contractual rights to use those Marks have terminated. *See Burger King Corp. v. Hall, supra,* 770 F.Supp. at 638 (citing *Clayton v. Howard Johnson Franchise Systems,* 730 F.Supp. 1553, 1559 (M.D.Fla.1988) ("after termination of the License Agreement [defendants'] refusal to choose a different name for the plaza and inn shows an *intent* to continue trading on the 'Howard Johnson's' mark") (emphasis added)).

■ 18. Finally, while actual confusion is not essential to a finding of likelihood of confusion, it is the " 'best evidence of likelihood of confusion.' " *John H. Harland Co. v. Clarke Checks, Inc., supra,* 711 F.2d at 978 (quoting *Amstar Corp. v. Domino's Pizza, Inc., supra,* 615 F.2d at 263); *Contemporary Restaurant Concepts, Ltd. v. Las Tapas–Jacksonville, Inc.,* 753 F.Supp. 1560, 1565 (M.D.Fla.1991) (citing *John H. Harland* and *Amstar*). In this case, defendants' unauthorized use of the BKC Marks can have no result other than to cause actual confusion. Consumers could not possibly know that defendants' restaurants, which for all purposes appear to be genuine Burger King® restaurants, are no longer affiliated with BKC. *Burger King Corp. v. Hall, supra,* 770 F.Supp. at 638.

19. In sum, the factors here establish an overwhelming likelihood of consumer confusion. Defendants' status as "holdover" franchisees alone is dispositive of the infringement issue. *Burger King Corp. v. Hall, supra,* 770 F.Supp. at 638. Therefore, BKC has proven a substantial likelihood of success on the merits of its claims for trademark infringement and unfair competition under the Lanham Act.

20. Defendants do not dispute that their present use of the BKC Marks is without BKC's license or consent. However, they contend that their franchises were wrongfully terminated and that they will establish their civil rights and antitrust claims in their damage action against BKC.

■ 21. Defendants' arguments are unavailing. To begin with, the evidence in this record clearly establishes that defendants' franchises were properly terminated for nonpayment. Moreover, as this Court held in identical circumstances in *Burger King Corp. v. Hall,* as a matter of law, a terminated franchisee's remedy for wrongful termination is an action for money damages and not the continued unauthorized use of its franchisor's trademarks. 770 F.Supp. at 638. Thus, while a terminated franchisee may seek money damages for any injuries resulting from the alleged wrongful termination of its franchise, it may not continue to use the franchisor's trademarks without authority in violation of law. *Id.; see Burger King Corp. v. Austin,* Bus.Fran. Guide (CCH) ¶ 9788 (S.D.Fla. Dec. 26, 1990); *Cle–Ware Rayco, Inc. v. Perlstein,* 401 F.Supp. 1231, 1234 (S.D.N.Y.1975).

22. There is no legal support for defendants' position that, because they have asserted alleged damage claims against BKC, they may therefore operate royalty and rent-free for however long their damage action remains pending. "[A] franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor. The franchisor has the power to terminate the relationship where the terms of the franchise agreement are violated." *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 373 (3d Cir.1992). The defendants themselves recognized the plain fallacy of their position when, following BKC's termination of their franchises, they freely en-

tered into stipulations with BKC agreeing to pay their ongoing contractual obligations.

23. Recently, in *S & R Corp. v. Jiffy Lube Int'l, Inc., supra*, the Third Circuit Court of Appeals rejected the same arguments proffered by defendants here. In *Jiffy Lube*, the franchisee commenced suit against his franchisor alleging that the franchisor breached the parties' franchise agreement when it failed to maintain the quality of its other franchises in the Philadelphia area, causing damage to the plaintiff's franchises. Like the franchisees here, the franchisee in *Jiffy Lube* stopped paying his royalties to the franchisor shortly before filing suit, but nonetheless continued to use the franchisor's trademarks in the operation of his three service centers. 968 F.2d at 374. In July 1990, some ten months after the franchisee commenced suit, the franchisor terminated the franchisee's three franchises for nonpayment. Claiming that the termination was improper, the franchisee continued to operate his service stations using the franchisor's "Jiffy Lube" mark. The district court denied the franchisor's motion to enjoin the franchisee's unauthorized use of its "Jiffy Lube" mark, finding that the termination dispute between the parties precluded a determination of the franchisor's likelihood of success on the merits. 968 F.2d at 374. Instead, the district court ordered that current royalties be paid into escrow until the termination dispute was resolved.

On appeal, the Third Circuit reversed. Citing *Burger King v. Austin, supra*, and this Court's decision in *Burger King Corp. v. Hall*, the Court of Appeals held that "[w]here the franchise agreement gives the franchisor the power to unilaterally terminate the agreement under certain conditions, and those conditions exist, pre-termination complaints are not relevant to infringement under the Lanham Act. Rather, pre-termination disputes affect the issue of damages." 968 F.2d at 377. Thus, the Court of Appeals held that while the franchisee "may have a legitimate claim for damages ... he does not have the right to continue using the [Jiffy Lube] trademark as an infringer." 968 F.2d at 377.

24. The same reasoning applies here. If the defendants sought to continue operating Burger King® franchises and to use the BKC Marks notwithstanding BKC's alleged wrongdoing—none of which is, in any event, supported by any probative evidence in this record—they should have continued paying the amounts due under their Franchise and Lease Agreements. Instead, defendants themselves opted to treat the agreements as effectively terminated by refusing to continue their own performance thereunder. Defendants having chosen to cease their own performance under the contracts, BKC acted in strict accordance with the parties' agreements when it terminated defendants' franchises and leases. While defendants may now continue to pursue their damage claims against BKC, they may not continue to infringe the BKC Marks in violation of the Lanham Act. In order to have preserved their rights to continue to use the BKC Marks, defendants should have continued to pay their contractual obligations to BKC. *Burger King v. Hall, supra*, 770 F.Supp. at 638–39; *see S & R Corp. v. Jiffy Lube Int'l, Inc., supra*, 968 F.2d at 375–377; *Burger King Corp. v. Austin, supra; Brosahd of Milwaukee, Inc. v. Dion Corp.*, [1989–1990 Transfer Binder] Bus.Franchise Guide (CCH) ¶ 9566, at 20,954 (E.D.Wis. Jan. 10, 1989).

25. If the law were otherwise, a franchisee asserting even the most frivolous damage claims against its franchisor would be able to operate royalty and rent-free for however long its action remained pending. Moreover, it would create an incentive for franchisees who have fallen behind in the payment of their contractual obligations to commence suit against their franchisor so as to avoid the termination of their franchises. Under such a scenario, there is a potential for enormous damage to other franchisees and to the entire franchising system itself. For example, the defendants' advertising contributions are used to pay for national advertising which benefits the entire Burger King® system. Without the ability to support such advertising, which depends on franchisees' adherence to

the terms of their franchise agreements, all BKC franchisees would be harmed.

26. Finally, as this Court held in *Burger King Corp. v. Hall,* defendants' "wrongful termination" defense also falls outside the exclusive list of eight statutory defenses to a trademark infringement action based on an incontestable mark. 770 F.Supp. at 639; *see* 15 U.S.C. § 1115(b); *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 145–46 (3d Cir.1981) (holding that trademark infringer's wrongful termination claim is simply "too far removed" from the Lanham Act infringement issue to constitute a defense). The statutorily enumerated defenses are the only permissible defenses to an action to enjoin the infringement of an incontestable trademark. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985); *Soweco Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1184–85 (5th Cir.1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981). Defendants have not raised a single statutorily enumerated defense here.

B. *Injunctive Relief Enforcing BKC's Termination Notices Is Specifically Authorized By The Parties' Stipulations*

27. BKC's request for injunctive relief is also authorized by the parties' stipulations. Specifically, BKC was given the right to enforce the termination notices and eject the defendants from their restaurants in the event they failed to pay their ongoing monetary obligations as required under the stipulations. That right was a specifically bargained for benefit to BKC in the stipulations.

28. Courts universally recognize the special role that stipulations play in litigation and the requirement that they be strictly enforced according to their terms. "[O]nce a stipulation has been entered into and approved by [the] court the express agreement of the parties will be strictly enforced." *In re Borchardt,* 47 B.R. 879, 881 (Bankr.D.Minn.1985). Courts will not "overlook or disregard stipulations which are absolute and unequivocal." *United*

*States v. Northern Colorado Water Conservatory Dist.,* 608 F.2d 422, 431 (10th Cir.1979).

29. Having received the status of a court order by this Court's approval of the parties' first stipulation on April 19, 1989, the parties' stipulation has a particularly sacrosanct status.

> If the parties submit such stipulation to the court and it is "So ordered and approved" by the court, the noncompliance by one of the parties with such stipulation ... has a double aspect both as a contract and as a court order.

*Stein & Day, Inc. v. Coordinated Systems & Services Corp.,* 83 B.R. 221, 226 (Bankr. S.D.N.Y.1988) (citations omitted); *United States v. Board of Education,* 588 F.Supp. 132, 139 (N.D.Ill.), *vacated on other grounds,* 744 F.2d 1300 (7th Cir.1984), *cert. denied,* 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985).

30. Having entered into stipulations with BKC, defendants are now bound by the terms of those stipulations.

C. *Defendants' Continuing Infringement Of The BKC Marks Will Irreparably Injure BKC*

31. Given the strong likelihood of consumer confusion and its likelihood of success on the merits, BKC has met its burden of demonstrating a substantial threat of irreparable injury and entitlement to an injunction *pendente lite. Burger King Corp. v. Hall, supra,* 770 F.Supp. at 639; *see E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, supra,* 756 F.2d at 1529–30 & n. 14; *Burger King Corp. v. Lee,* 766 F.Supp. 1149, 1157 (S.D.Fla.1991); *Sundor Brands, Inc. v. Borden, Inc., supra,* 653 F.Supp. at 93. Having found that BKC is likely to prove at trial that defendants are infringing its trademarks, the Court finds that BKC has *a fortiori* established irreparable injury.

D. *The Threatened Injury To BKC Outweighs Any Threatened Harm To Defendants*

32. The threatened harm to BKC outweighs any harm defendants may suf-

fer from the grant of injunctive relief. As aptly noted in *American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103, 107 (2d Cir.1978), "[o]ne who adopts the mark of another for similar goods acts at his own peril," since he has no claim to the profits or advantages thereby derived. Any harm suffered by defendants was brought about by their own actions in refusing to pay their contractual obligations to BKC. Defendants' self-inflicted harm is far outweighed by the immeasurable damage done BKC by the infringement of its Marks. Defendants simply have no equitable standing to complain of injury should their infringements be preliminarily enjoined. *Burger King Corp. v. Hall, supra,* 770 F.Supp. at 640.

E. *The Public Interest Will Be Furthered By The Issuance of The Requested Relief*

 33. Finally, public policy considerations mandate the requested relief. Consumers who rely upon the BKC Marks in patronizing defendants' restaurants are being deceived into purchasing products under the mistaken belief that defendants are operating genuine Burger King® restaurants, "backed by BKC as [their] sponsor, and subject to BKC's stringent quality and service controls." *Burger King Corp. v. Hall, supra,* 770 F.Supp. at 640. Granting injunctive relief to BKC thus will serve the public interest by preventing consumer confusion. *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,* 794 F.2d 38, 44 (2d Cir.1986); *Burger King Corp. v. Lee, supra,* 766 F.Supp. at 1157–58.

> "[T]he public will be protected and secure in their knowledge that when they patronize a restaurant which utilizes the Burger King trademarks, service marks and other logos, that restaurant is a properly licensed and authorized and franchised Burger King restaurant."

*Burger King Corp. v. Hall, supra,* 770 F.Supp. at 640.

## CONCLUSION

Accordingly, Defendants' motion for a temporary restraining order and preliminary injunction is DENIED[5] and BKC's motion for entry of a preliminary injunction is GRANTED, and it is ORDERED that:

Defendants Nasif R. Majeed, A & M Fast Foods, Inc., Reginald Underwood, Leroy Kelly, Dorothy Allen, Leedot Enterprises, Inc., Rubin Dale McCollum, Adrienne M. McCollum, John Davis, Judith G. Davis and Ferryboat Associates, their agents, employees, representatives, and all persons acting in concert with them, or under their control, are hereby preliminarily enjoined from:

1. Using or displaying BKC's trademarks or service marks, or any other logos, symbols or trade dress of BKC, or any confusingly similar trademarks, service marks, logos, symbols or trade dress, in connection with the advertising, distribution, display or sale of any product or service; and

2. Making in any manner whatsoever any statement or representation, or performing any act, likely to lead members of the public to believe that Defendants or Defendants' restaurants are in any manner, directly or indirectly, associated, affiliated, or connected with, or licensed, sponsored, authorized or approved by BKC.

3. Within twenty (20) days of the date of this Order, Defendants shall (i) vacate the premises of their Burger King® restaurants in accordance with the termination of their Franchise and Lease Agreements and the terms of the stipulations; (ii) turn over to representatives of BKC all copies of BKC's MOD Manual, Operations Manual and any other printed materials containing BKC's operating instructions and business practices which Defendants used or possessed in connection with the operation of

---

5. The Court finds that defendants have not established a likelihood of success on the merits of their claims or that they will be irreparably harmed if an injunction does not issue in their favor. In particular, there is no evidence that the termination of defendants' franchises resulted from anything other than their own decision to stop paying their contractual obligations to BKC.

their terminated Burger King® franchises; and (iii) fully comply with the post-termination covenants of their Franchise and Lease Agreements.

4. BKC shall post a bond in the amount of $75,000, as security.

5. Defendants are further instructed to file and serve within thirty days after entry of this preliminary injunction a report in writing under oath setting forth in detail the manner and form in which they have complied with this preliminary injunction.

DONE AND ORDERED.